SEABROOK FOODS, INC., Appellant.

v.

BAR–WELL FOODS LIMITED, Appellee.

Appeal No. 77–547.

United States Court of Customs and Patent Appeals.

Dec. 22, 1977.

Rehearing Denied Feb. 8, 1978.

Arthur J. Greenbaum, New York City, attorney of record for appellant; Carol Faye Simkin, New York City, of counsel.

C. Lyman Emrich, Jr., Chicago, Ill., attorney of record for appellee; Robert R. Caliri, Chicago, Ill., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

1. 193 USPQ 797 (1977).

MILLER, Judge.

This appeal is from the decision of the Trademark Trial and Appeal Board ("board")[1] dismissing Seabrook's opposition, filed April 22, 1974, to Bar-Well's application No. 463,140, filed July 16, 1973, for registration of the mark shown below for frozen fruits and frozen vegetables. We affirm.

## BACKGROUND

Opposition is based on Seabrook's prior use of the mark shown below, registration No. 819,209, issued November 22, 1966, for frozen prepared foods including a variety of frozen vegetables.[2]

Opposer is the third largest manufacturer, in terms of sales, of frozen vegetables in the United States. Its composite mark appears several times on its packages, sometimes without the drawing of a farm. On at least some packages, the principal design

2. The drawing of Seabrook's mark is lined for the colors blue and green.

portion of the mark, termed by Seabrook a "stylized leaf design,"[3] surrounds a picture of a hand placing a food product enclosed in a clear plastic bag into a pan of boiling water. The words "In Boilable Bag" appear immediately below the design.[4]

Bar-Well is a Canadian corporation engaged in the processing, importing, and exporting of frozen foods. The board found that "[a]pproximately 90% of the orders for [Bar-Well's] goods are made by telephone," with customers usually ordering by the name "Arctic Gardens." Bar-Well introduced a number of third-party registrations showing use of designs assertedly similar to both its and Seabrook's design portions of their respective marks. It also presented evidence showing actual use of two assertedly similar design marks on frozen foods. In answer to Seabrook's interrogatories, Bar-Well admitted that "it had general knowledge of the use of the design on Opposer's packaging as well as the use of a substantially identical design by other parties."

Although the board found that "the goods of the parties are for all practical purposes identical," it concluded that there would be no likelihood of confusion of consumers by contemporaneous use of the two marks by the parties. It noted that Seabrook had offered no evidence to support its allegation that its design, per se, had "acquired great value as an identification of source of opposer" except for its volume of sales and that the third party uses and

registrations introduced by Bar-Well suggested that Seabrook's design was not "unique in the field of food products." The board also concluded that Seabrook had not proved that Bar-Well adopted its (Bar-Well's) design "with an intent to trade upon the goodwill of opposer."

## OPINION

The threshold question is whether the design portion of Seabrook's mark functions independently of the word portion of the mark in identifying and distinguishing the goods of Seabrook from those of others.

The board did not comment on whether it considered Seabrook's design inherently distinctive, although, from its decision to dismiss the opposition, it evidently was not persuaded that the design makes such an impression on consumers that they will assume Seabrook to be the source of the goods upon seeing a similar design on identical or closely related goods.

■ In determining whether a design is arbitrary or distinctive this court has looked to whether it was a "common" basic shape or design,[5] whether it was unique or unusual in a particular field,[6] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods,[7] or whether it was capable of creating a commercial impression distinct from the accompanying words.[8]

---

3. Appellant refers to a "leaf" design (within which the words and farm design appear), while the board refers to "oval" design with the notation that the design "is not strictly speaking an oval." See *Marcalus Mfg. Co. v. Watson,* 103 U.S.App.D.C. 299, 258 F.2d 151, 118 USPQ 7 (1958). We observe that what appears to be two stems in appellant's design indicates that the design is not strictly speaking a leaf.

4. The reverse side of such packages shows the same picture of the hand placing a bag into boiling water without the "oval" ("leaf") design but with directions for cooking the contents of the package.

5. See, *e. g., In re Hillerich & Bradsby Co.,* 204 F.2d 287, 40 CCPA 990, 97 USPQ 451 (1953);

*In re David Crystal, Inc.,* 49 CCPA 775, 296 F.2d 771, 132 USPQ 1 (1961).

6. *In re Data Packaging Corp.,* 453 F.2d 1300, 59 CCPA 776, 172 USPQ 396 (1972); see also, *In re Hillerich & Bradsby Co.,* supra note 4, and *Radio Corp. of America v. Decca Records, Inc.,* 51 F.Supp. 493, 58 USPQ 531 (D.C.N.Y.1943).

7. *In re General Tire & Rubber Co.,* 404 F.2d 1396, 56 CCPA 867, 160 USPQ 415 (1969); *Plastilite Corp. v. Kassnar Imports,* 508 F.2d 824, 184 USPQ 348 (Cust. & Pat.App.1975).

8. *In re E. J. Brach & Sons,* 256 F.2d 325, 45 CCPA 998, 118 USPQ 308 (1958); *In re Swift & Co.,* 223 F.2d 950, 42 CCPA 1048, 106 USPQ 286 (1955).

On the evidence of record, we are persuaded that Seabrook's design is more akin to the decorative panel in *E. J. Brach & Sons, supra* note 7, which served as background for the word portion of the mark and was held to be "not itself distinctive," than to the label in *Swift & Co., supra* note 7, which this court held to be "an unmistakable, certain, and primary means of identification pointing distinctly to the commercial origin of such product." [9]

We note Bar-Well's evidence of third-party uses and registrations of similar marks on frozen foods,[10] indicating that Seabrook's "oval" design is not unique in this field. Particularly noteworthy are the High Liner and Acme-Ideal marks [11] in actual use on frozen fish and frozen vegetables, respectively. To frame the word portion, the composite High Liner mark includes a highly similar "oval" to that of appellant, and the composite Acme-Ideal mark includes a modified "oval." [12]

■ The only evidence presented by Seabrook on secondary meaning is the sales volume of its products. Although such evidence may have relevance in establishing secondary meaning (see *In re Hollywood Brands, Inc.,* 214 F.2d 139, 41 CCPA 1001, 102 USPQ 294 (1954)), it is not necessarily indicative of recognition of the mark by purchasers as an indication of source of the goods. See *In re International Spike, Inc.,* 190 USPQ 505, 507 (TTAB 1976), and cases cited therein. There is no persuasive evidence that the *design* portion of Seabrook's mark has acquired secondary meaning, such as might be shown by a consumer survey or by advertising emphasizing the design portion of the mark to potential customers coupled with a showing that such advertising had consumer impact. All sales were made under the composite words-plus-design mark.

■ We conclude that the principal function of Seabrook's design is not to identify and distinguish the source of the goods. Seabrook contends that it "intentionally selected this mark because its distinctiveness would enable the design to distinguish its products from those of others." However, regardless of Seabrook's intentions, it is the association, by the *consumer,* of the "oval" design with Seabrook as the source that is determinative. See *Plastilite Corp. v. Kassnar Imports, supra* note 6; *Hydra Mac, Inc. v. Mack Trucks, Inc.,* 507 F.2d 1399, 184 USPQ 351 (Cust. & Pat.App.1975). Contrary to Seabrook's assertions, it does not appear that "[t]he design is displayed prominently and is visually outstanding in relation to everything else on the package, including the word mark Seabrook Farms." The mark appearing on the side and end flaps of Seabrook's packages always consists of the words "Seabrook Farms" framed by the "oval" design. The design is never displayed alone. Its only use separately from the words "Seabrook Farms" (alone or with the drawing of a farm) is with a picture of a hand placing a plastic bag of food product into a pan of water accompanied by the words "In Boilable Bag," and this is on a package also containing the design with "Seabrook Farms."

Since Seabrook has not shown that the design portion of its mark is inherently distinctive or that it has acquired secondary

9. Evidence in the *Swift* case showed that Swift's extensive advertising had conditioned purchasers to "Pick the POLKA DOT Package." Seabrook has presented no such objective evidence, a gap which the dissenting opinion undertakes to fill subjectively.

10. This court has repeatedly held, in cases involving the issue of likelihood of confusion, that food products are related goods. See, *e. g., Continental Nut Co. v. Le Cordon Bleu, S.a.r.l.,* 494 F.2d 1395, 181 USPQ 646 (Cust. & Pat.App.1974); *In re Continental Baking Co.,* 390 F.2d 747, 55 CCPA 967, 156 USPQ 514 (1968). Here, the similarity of the goods—frozen processed foods—is apparent; whether fish, meat, or vegetables, they are likely to be sold in the same section of a supermarket.

11. See 193 USPQ, *supra* note 1, at 799.

12. The other third-party registrations appear to have little evidentiary value in determining the scope of protection to be given opposer's mark since they are not shown to have been in actual use. *Hunt Foods & Industries, Inc. v. Gerson Stewart Corp.,* 367 F.2d 431, 54 CCPA 751, 151 USPQ 350 (1966).

meaning, the ultimate issue of likelihood of confusion must be determined from a consideration of the marks as a whole.[13] On this basis, we hold that there is no likelihood that purchasers confronted with the involved marks, which have totally different word portions and convey different commercial impressions (for example, "Arctic" and the penguin on the Bar-Well's mark conveys the impression of frozen goods; "Farms" and a drawing of a farm on Seabrook's mark conveys an impression of where the goods were grown), would attribute a common source to the goods of the parties.

Seabrook raises the issue of alleged "intentional copying" by Bar-Well. However, the only evidence on the point is an admission from Bar-Well that one of its officers was aware of Seabrook's mark at the time Bar-Well adopted its mark, and a denial that it copied Seabrook's design. More than this is required to establish intentional copying, the dissenting opinion to the contrary notwithstanding.

The decision of the board dismissing the opposition is *affirmed.*

*AFFIRMED.*

RICH, Judge, dissenting, with whom MARKEY, Chief Judge, joins.

With all due respect, I disagree with the opinion of the majority point by point. Applicant has inexcusably copied an inherently distinctive, origin-indicating feature of opposer's registered trademark which could only have been done for the purpose of creating purchaser confusion. This opposition should be sustained if only as a matter of promoting business morality. Ex post facto, the applicant-appellee has scrounged around in the field for excuses to justify its conduct and should not be given the encouragement of the unduly legalistic reasoning of the majority opinion, which focuses excessively on matters opposer might have proved but did not and substitutes legal technicalities for common sense. The principle elements of this case are in the category of *res ipsa loquitur* and did not have to be proved. They literally hit one in the eye, as they will hit purchasers.

This case involves off-the-shelf merchandise—frozen foods—presented to the general purchasing public in supermarkets and grocery stores, as relatively low-priced as foods can be these days, and purchased, as everyone knows, to a large degree on the basis of package appearance as well as by the name of the producer or specific word marks.

A little more must be said about opposer's mark, beside what appears in the majority opinion and in the reproduction of the registration drawing. The majority, while it makes a few comments about opposer's use of the mark, fails to make clear that in its manner of use it is a principal feature of the frozen-food package design which is bound to impress itself on purchasers. Only an illustration of a typical package can make this clear. The reproduction below is of a cardboard package in the flat for frozen beef stew. It is printed in use in full colors and, as the registration indicates, the trademark design, which surrounds the entire package, is in two colors, alternately blue and green. Running around the entire box, as it does, the design is visible on all sides and the leaf motif is repeated on one end and on opposite sides of the main stem around the box. In real life, the colors make the design of the registered mark more prominent than the reproduction indicates. I have marked the colors of the segments with the letters "b" and "g" for blue and green.

---

**13.** We do not believe it appropriate here to apply the general rule that it is the word portion of a composite mark that is dominant. The board apparently overlooked the fact that neither Seabrook's registration nor Bar-Well's application contains any limitation on methods of distribution or channels of trade; presumably the goods can be displayed side-by-side for sale in a supermarket. Since most, if not all, supermarkets today are self-serve, purchasers would not "call for goods," but would "look" for them. As pointed out in note 8, *supra,* appellant has not, for example, shown any advertising for shoppers to "look for the leaf design."

# Beef stew

SEABROOK
FARMS

SEABROOK
FARMS

# Beef
# stew

## NET WT. 8 OZ.

## IN BOILABLE BAG

SEABROOK
FARMS

SEABROOK
FARMS

Beef stew

SEABROOK
FARMS

# Beef stew

## *Serving suggestions*

While beef stew is heating, bake refrigerated biscuits as directed on biscuit package.

Empty stew into casserole and top with hot biscuits. Serve with crisp green salad.

## FREE COOKBOOK!

Order your free copy of SEABROOK'S 65 page full-color Miracle Menu Planner today! Just send front panel from this package to: SEABROOK FARMS, Department 5, Seabrook, N.J.

KLIKLOK

10609  7/65

Applicant, like opposer, depicts in its application one segment of its mark. Omitting the words and the bird, it is identical with the design portion of opposer's mark except for mention of color. The exhibits of applicant's mark in evidence show its leaf motif design to be all blue and they also show that the way the mark is used in commerce is the same as opposer's use, a repetitive, continuous vine-like pattern extending entirely around the package, displaced from an edge by about one-third of the width of the label and repeating the leaf motif on alternate sides of the main stem.

My first point of disagreement with the majority's reasoning is that the mark of opposer is not inherently distinctive. I think the mark, particularly as *used* by opposer,[1] is inherently distinctive, and one has to do no more than contemplate one of opposer's packages to come to that conclusion. It would be trite to say that a case can surely be found to support any such conclusion (or the contrary) and so I shall say only that opposer's design is at least as distinctive as the designs held inherently distinctive in *In re Swift & Co.,* 42 CCPA 1048, 223 F.2d 950, 106 USPQ 286 (1955), and in *Esso Standard Oil Co.,* 305 F.2d 495, 49 CCPA 1351, 134 USPQ 402 (1962). It is certainly not common, or basic, or a mere refinement of a well-known form, and it certainly is unique, unusual, and capable of creating a commercial impression on its own. I cannot agree that it is "akin to the decorative panel" in the *Brach* case[2] relied on by the majority but distinguished in *Esso,* supra. It is not an "oval" design. It does not look like a stylized outline of a fish, which is what the third-party marks relied on mostly are. Because of the mark's prominence, I can give no weight to the majority's observation that it is never displayed alone. Neither was the polka dot design in *Swift* or the label design in *Esso.* Neither are many famous design marks; in fact, it is *association* with the word mark that connects it in the public mind with a specific origin so that the origin comes to mind upon seeing the design, even when different words are associated with it. That is opposer's legitimate fear.

Accordingly, I conclude that the design portion of opposer's mark *is* inherently distinctive in the field of frozen foods.

On the majority's point 2, whether the design acquired a "secondary meaning," I need say nothing since a mark that is inherently distinctive inherently has a "secondary meaning," particularly after it has been used, as here, on a billion packages of frozen foods since 1965. Seabrook's evidence of that sales volume was all it needed to produce. One does not need a consumer survey to establish the obvious. Secondary meaning need not be proved with respect to inherently distinctive marks. *In re Esso, In re Brach,* and *In re Swift,* all supra.

On the likelihood of confusion issue, I can agree wholeheartedly with the majority's footnote 12 which points out the lack of any limitations on how the goods are sold and that they might well be in the same supermarkets, and even side by side, where purchasers would select them by *looking* at them (perhaps without their glasses). Since I disagree with the majority view that the mark of opposer lacks inherent distinctiveness in its design portion, I also disagree that the marks as a whole would not be likely to cause confusion. The TTAB had "no doubt" that applicant's design "closely resembles the corresponding design portion of opposer's * * * mark."

I can give no weight at all to the evidence on the "copying issue" that Bar-Well did not copy. Such evidence, in the face of the other visual evidence, is simply incredible.

I would reverse with the comment that the TTAB perhaps gave improper weight to Bar-Well's mode of marketing its food—the fact that 90% of its orders were received by telephone and by name is referred to in its opinion. The application, as the majority noted, is without limitation as to marketing

---

1. Opposer is as much entitled to rely on its *use* as on its registration. 15 USC 1052(d).

2. *In re E. J. Brach & Sons,* 256 F.2d 325, 45 CCPA 998, 118 USPQ 308 (1958).

methods. The goods being identical, it must be presumed that they travel in the same trade channels. I think too much weight was given to third parties' conventionalized fish outlines on fish products, which are readily distinguishable even by undiscriminating grocery purchasers. Since the early Christians scribbled their fish symbols,[3] common folk have readily perceived the difference in appearance between fish and vines.

---

**3.** See Encyclopedia Britannica (1942)— FISH, * * *.

The fish was an early symbol of Christ in primitive and mediaeval Christian art. The origin is to be found in the initial letters of the names and titles of Jesus in Greek, Jesus Christ, Son of God, Saviour, which together spell the Greek word for "fish," Ιχθύς.