Paper No. 10
GDH/gdh

7/13/98

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

In re Jon P. File
_____

Serial No. 74/708,137
_____

Daniel D. Chapman of Gunn, Lee & Miller, P.C. for Jon P. File.

Jeri J. Fickes, Trademark Examining Attorney, Law Office 108
(David Shallant, Managing Attorney).
_____

Before Simms, Hohein and Hairston, Administrative Trademark
Judges.

Opinion by Hohein, Administrative Trademark Judge:

Jon P. File has filed an application to register the

matter shown below, which is described as a "mark [which]

consists of tubular lights running lengthwise down bowling lanes

projecting over the gutters," as a service mark for

"entertainment services in the nature of a bowling alley".[1]

---

[1] Ser. No. 74/708,137, filed on July 31, 1995, which alleges dates of
first use September 1, 1994. The broken or dotted lines show the
location of applicant's putative mark but do not form part thereof.
See Trademark Rule 2.51(d) and TMEP §1202.03(c).

Registration has been finally refused under Sections 1, 2, 3 and 45 of the Trademark Act, 15 U.S.C. §§1051, 1052, 1053 and 1127, on the ground that, as shown by the photographs of the interior of applicant's bowling alley facility which were submitted as specimens of use, the matter which applicant seeks to register does not function as a service mark. Specifically, as stated in her final refusal, the Examining Attorney contends that "[t]he proposed mark is not inherently distinctive" and that, "[a]bsent promotion of applicant's lighting design as serving ... a source indicating function, consumers would simply assign the lighting placement its normal value as a decorative element of interior design."

Applicant has appealed. Briefs have been filed, but an oral hearing was not requested. We affirm the refusal to register.

Applicant, in support of his position that the matter sought to be registered is an inherently distinctive mark, has submitted a declaration in which he states, among other things, that he has been involved in the bowling industry since 1993 and has been "offering the novel trade dress lights for over the past two (2) years"; that he has "attended numerous bowling trade shows over the past three (3) years," is "familiar with novel bowling games, alleys, and apparatus" and has "read the standard trade publications over the past few years"; that he "know[s] of no other bowling alley using the placement of tubular lights lengthwise down the bowling lanes on bumpers which project out over the gutters prior to [such use by] applicant"; and that "[t]here are many ways to light the interior of a bowling alley for the purposes of providing visibility," including "lights on the walls, masking units, pinsetters, concourse, ceiling, seating, ball returns, approach, [or] handrails, or in the counter area," which are "far superior to the use of tubular lights extending longitudinally down the gutters".

Applicant further avers in his declaration that his "customers perceive the trade dress to be attractive, but primarily as a source indicator rather than a commonplace variation of a complex lighting design"; that, in his experience and opinion, "[t]he trade dress ... is not a minor variation, but [is] a major departure from previous bowling alley lighting due to the location and shape of the lights" and which, to his knowledge, "has never been done before"; that applicant's lights "do not assist in visibility to the bowlers"; that such lights,

3

"while being somewhat cosmetic, are primarily distinctive to the consumer"; that "[t]housands of customers have utilized ... applicant's bowling services directly adjacent [to] the distinctive and novel lights"; that the lights "are readily visible to all bowlers in a bowling alley" and create, "especially when used on a number of adjacent lanes, a very striking, distinctive, and novel appearance heretofore unavailable"; and that it is applicant's "experience, working in bowling alleys and the bowling industry, that this distinctive lighting is immediately recognizable as a source" for applicant's bowling services.

Applicant asserts that it is "the placement and structure of the lighting system ... [which] serve a source-indicating function to the consuming public." Specifically, according to applicant:

> Most bowling alley interior lighting systems are directed towards the illumination of space for the purpose of carrying out the game of bowling. While such lighting systems as a whole could not be classified as inherently distinctive, Applicant's lighting design, which serves not to illuminate an area (as does a ceiling light fixture) but rather serves as a notice to the public of the source of the services being provided (as does a neon sign that explicitly spells out a trademark term), can be classified as inherently distinctive. Applicant agrees that most lighting schemes to be found in bowling alleys for the purposes of illuminating an area and/or creating a pleasant environment within which to bowl, could not be characterized as inherently distinctive. The public has come to accept, both in bowling alleys and in other entertainment areas, the placement of lights in a variety of positions for the purposes of facilitating the entertainment activity and

making it more enjoyable. As the Examining Attorney correctly states, lighting systems for this purpose can and have been placed in or on a number of structural elements associated with bowling alleys and bowling activities.

Applicant's lighting system, on the other hand, is unique in its placement and arrangement for a number of reasons. First, it is, and has been, extremely difficult to configure lighting systems in the position and placement of Applicant's trade dress. Normally, this position and placement will come into direct contact with heavy weight bowling balls during the bowling activity and would normally be destroyed, crushed, or otherwise damaged by the customers carrying out the activity. It goes without saying that Applicant's trade dress positioning of the lighting system has overcome this concern through the use of lighting structures that are not susceptible to damage as the result of contact from bowling balls. This characteristic alone establishes Applicant's trade dress as something unique, distinctive, and unexpected to the consuming public.

Applicant thus insists that, because his trade dress, which consists of tubular lengthwise lighting located adjacent to the gutters of bowling alley lanes, differs in significant respects-- by virtue of the unexpected and previously impractical placement of the lighting system--from the lighting systems employed by others who operate bowling alleys, such trade dress is inherently distinctive and is registrable.

We agree with the Examining Attorney, however, that customers for bowling alley entertainment services would regard applicant's trade dress simply as an element of interior decoration and would not, therefore, immediately perceive such trade dress as a source indicator. As the Board noted in In re Hudson News Co., 39 USPQ2d 1915, 1922 (TTAB 1996), *aff'd in*

*decision without published opinion*, 1997 U.S. App. LEXIS 15556
(Fed. Cir. June 12, 1997), case law and other authority have
essentially adopted the test set forth in the leading case of
Seabrook Foods, Inc. v. Bar-Well Foods, Ltd., 568 F.2d 1342, 196
USPQ 289, 291 (CCPA 1977), for determining whether matter is
inherently distinctive (footnotes omitted):

> In the case now before us, we have
> looked to our primary reviewing court, the
> Federal Circuit (or, more accurately, its
> predecessor, the U.S. Court of Customs and
> Patent Appeals) for guidance.  In determining
> whether a design (or, in this case, trade
> dress) is inherently distinctive, the Court
> in the past
>
>> has looked to whether it was a
>> "common" basic shape or design,
>> whether it was unique or unusual in
>> a particular field, [or] whether it
>> was a mere refinement of a
>> commonly-adopted and well-known
>> form of ornamentation for a
>> particular class of goods viewed by
>> the public as a dress or
>> ornamentation for the goods[.]
>
> Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.,
> 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977).
> Other courts have relied on the *Seabrook* case
> when considering whether or not a claimed
> trade dress is inherently  distinctive.  See:
> Brooks Shoe Manufacturing Co. v. Suave Shoe
> Corp., 716 F.2d 854, 221 USPQ 536 (11th Cir.
> 1983); AmBrit Inc. v. Kraft Inc., 805 F.2d
> 974, 1 USPQ2d 1161 (11th Cir. 1986); Turtle
> Wax Inc. v. First Brands Corp., 781 F.Supp.
> 1314, 22 USPQ2d 1013 (N.D. Ill. 1991); and
> Jungle Rags Inc. v. Rainbow Graphics Inc., 29
> USPQ2d 1704 (M.D. Fla. 1993).  The above-
> mentioned factors were recently summarized
> by the Federal Circuit in determining whether
> or not a trade dress is inherently
> distinctive:
>
>> Thus, the focus of the inquiry is
>> whether or not the trade dress is
>> of such a design that a buyer will

> immediately rely on it to
> differentiate the product from
> those of competing manufacturers;
> if so, it is inherently
> distinctive.

Tone Brothers Inc. v. Sysco Corp., 31 USPQ2d 1321, 1331 (Fed. Cir. 1994), citing Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 582-84, 27 USPQ2d 1189, 1192-93 (2d Cir. 1993). *Restatement (Third) of Unfair Competition*, §16, comment b appears to essentially adopt the *Seabrook* test:

> If the trade dress used by a
> particular seller differs in
> significant respects from that
> employed by others, consumers may
> be expected to utilize the trade
> dress as an indication of source
> ....  Trade dress that is unique
> and prominent can thus be
> inherently distinctive.  If the
> trade dress is descriptive (see
> §14), or inconspicuous, or not
> sufficiently different from that
> used by others to justify a
> conclusion of inherent
> distinctiveness, trademark rights
> will depend upon proof of
> distinctiveness through evidence of
> secondary meaning.

We thus dispense with applicant's discussion of its trade dress under the analysis set forth in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9, 189 USPQ 759, 764 (2d Cir. 1976) ... [since] we see no reason in the case now before us to engage in an *Abercrombie* type of analysis. The Examining Attorney here has not refused registration on the basis that applicant's trade dress is generic or descriptive. Rather, the ground of refusal essentially is that applicant's trade dress would not be perceived by the purchasing public as an indicia of source and that, therefore, the trade dress is not inherently distinctive. Accordingly, we look to the factors in the *Seabrook* case in assessing whether or not the trade dress sought to be registered in the

7

involved applications is inherently
distinctive.

As the Examining Attorney correctly observes, "the essential criterion of an inherently distinctive mark is that it is immediately recognizable by consumers as a source indicator." Applying the *Seabrook* test for inherent distinctiveness to the present case, we find nothing in the record which would lead us to believe that consumers of bowling alley entertainment services would immediately perceive and rely upon applicant's tubular lighting arrangement as an indication of source. Rather, it is common for places of indoor entertainment to employ various lighting schemes for decorative purposes and not merely as sources of illumination. Whether such lighting schemes be neon displays, florescent tubular lights and/or incandescent bulbs, lights are frequently used in various colors, patterns and/or locations to enhance the atmosphere of indoor places of amusement and are typically viewed, even when the arrangement of the lighting may be regarded as striking or unusual, as simply part of the overall interior decor or ornamentation. We consequently concur with the Examining Attorney that, "[g]iven this common experience, it is ... reasonable to assume that the public's perception of applicant's proposed mark would be as a mere refinement of a commonly used form of decor for commercial establishments rather than an inherently distinctive indicator of source for bowling alley services." See In re Hudson News Co., supra at 1923-24 [Board, in finding that prospective purchasers are not likely to perceive a "cool bluish, clean and salubrious

newsstand shopping environment" motif as a symbol of identification, indicated that such purchasers will view the trade dress as nothing more than interior decoration due to the commonality of the ornamental elements, including colored fixtures and lighting, which comprise the motif].

Applicant, in fact, concedes as much, admitting in its initial brief that, as noted earlier, "most lighting schemes to be found in bowling alleys for the purposes of illuminating an area and/or creating a pleasant environment within which to bowl ... could not be characterized as inherently distinctive" since "[t]he public has come to accept, both in bowling alleys and in other entertainment areas, the placement of lights in a variety of positions for the purposes of facilitating the entertainment activity and making it more enjoyable." Applicant's contention, however, that it is the assertedly unexpected and previously impractical placement of the its tubular lighting scheme which causes it to function as a source indicator is not borne out by the declaration of record, which gives no cogent reason why such scheme would be "primarily distinctive to the consumer" of applicant's bowling alley entertainment services. As the Examining Attorney convincingly points out:

> [T]here is no persuasive evidence of record
> that placement of lighting tubes down the
> length of bowling alley gutters is
> [currently] "impractical." Applicant merely
> states [in its initial brief] that "it is,
> and has been, extremely difficult to
> configure lighting systems in the position
> and placement of Applicant's trade dress."
> .... According to applicant, it is the
> likelihood of the lighting being destroyed,
> crushed or otherwise damaged by bowling balls

9

which makes such placement impractical. Applicant then goes on to state that "[i]t goes without saying that Applicant's trade dress positioning of the lighting system has overcome this concern through the use of lighting structures that are not susceptible to damage as a result of contact from bowling balls." .... However, if lighting structures exist so that impact damage is minimized or eliminated, then placement of lighting tubes where they may encounter impact is not impractical. Moreover, even if applicant's lighting arrangement is "impractical," consumers would have to perceive such placement as impractical, which would assume some unlikely degree of expertise in lighting systems and impact resistance. Finally, even if potential damage from ball impact makes placement of lighting tubes running down along gutters "impractical" and consumers would perceive it as such, impractical placement of lighting may not be remarkable given the similar uses of lighting on ball returns, pinsetters and embedded in lanes, areas apparently equally susceptible to impact damage.

Lastly, with respect to applicant's showing by his declaration that his tubular lighting arrangement is novel or unique in the bowling industry in that he "know[s] of no other bowling alley using the placement of tubular lights lengthwise down the bowling lanes on bumpers which project out over the gutters prior to [such use by] applicant," the Examining Attorney is again correct that, "as prior case law has made clear, the circumstances of an applicant being 'the one and only' user of a proposed mark does not in and of itself elevate that mark to the level of uniqueness required for inherent distinctiveness." In particular, as stated by the Board in In re E S Robbins Corp., 30 USPQ2d 1540, 1543 (TTAB 1992), "[i]f the concept of inherent distinctiveness was defined as meaning simply 'one and only,'

then one could obtain a registration for a design which, while 'unique' in this sense, differed only slightly from the designs of other competing products and/or containers."

In the present case, as in *Hudson News*, supra at 1924, not only is there no evidence that the trade dress at issue has ever been promoted by applicant as its service mark, but the record is completely devoid of evidence that anyone other than applicant regards an arrangement of tubular lights running lengthwise down bowling lanes and projecting over the gutters as a service mark for bowling alley entertainment services even though, to the best of applicant's knowledge, he is the sole user of such a trade dress in the bowling industry. Instead, applicant's lighting scheme, as shown by the specimens of use, is employed in a merely ornamental or decorative way to highlight the bowling alley lanes (including the gutters), with such a lengthwise or longitudinal theme being echoed by the stripes on the wall of applicant's facility. Applicant's tubular lighting arrangement, in fact, runs the entire length of each of the lanes in his bowling alley and, thus, would most likely be perceived by patrons of applicant's services simply as part of the overall decor or ambiance of his bowling alley establishment.

We consequently agree with the Examining Attorney that applicant's particular trade dress is not inherently distinctive. Customers for applicant's bowling alley entertainment services would not be likely to regard applicant's tubular lighting scheme as identifying and distinguishing the source of such services, given the admitted expectation of the public with respect to the

11

enhancement of the entertainment experience which is provided by the use of decorative or ornamental lighting.  Instead, even though applicant views his particular trade dress as "a major departure from previous bowling alley lighting due to the location and shape of the lights," the use by applicant of a novel or striking scheme of tubular lights running lengthwise down bowling lanes and projecting over the gutters would be perceived by customers for bowling alley entertainment services as simply a refinement of the commonplace decorative or ornamental lighting arrangements to which they have become accustomed and would not be inherently regarded as a source indicator.  See, e.g., In re Hudson News Co., supra at 1925 [various blue trade dress motifs for newsstand services not inherently distinctive since such are "simply a mere refinement of a basic blue interior decorating scheme"]; In re F.C.F. Inc., 30 USPQ2d 1825, 1828 (TTAB 1994) [rose design packaging for cosmetics not inherently distinctive inasmuch as it "appears to be no more than a mere refinement of a basic, relatively common and well-known form of decoration or ornamentation for cosmetic packaging and would be so regarded by the public"]; and Wiley v. American Greetings Corp., 226 USPQ 101, 103-104 (1st Cir. 1985) [red heart, permanently affixed to the left breast of a teddy bear, not inherently distinctive (even if unique) because it "is simply a mere refinement of a red heart motif which is a commonly adopted and well-known means of ornamentation for teddy bears, other stuffed animals and toys in general].

**Decision**:   The refusal to register is affirmed.

R. L. Simms

G. D. Hohein

P. T. Hairston
Administrative Trademark Judges,
Trademark Trial and Appeal Board