This Opinion is a
Precedent of the TTAB

Mailed: February 27, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Frankish Enterprises Ltd.*

_____

Serial No. 85494703

_____

Frank H. Foster of Kremblas & Foster for Frankish Enterprises Ltd.

Brian Pino, Trademark Examining Attorney, Law Office 114 (K. Margaret Le, Managing Attorney).

_____

Before Richey, Deputy Chief Administrative Trademark Judge, and Kuhlke and Adlin, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Frankish Enterprises Ltd. ("Applicant") seeks a Principal Register registration

for the mark shown below



for "Entertainment services, namely, performing and competing in motor sports events in the nature of monster truck exhibitions."[1] The application includes this description of the mark: "The mark consists of a truck cab body in the design of a fanciful, prehistoric animal. The matter shown by dotted lines is not part of the mark, but serves only to show the position of the mark"; color is not claimed as a feature of the mark.

The Examining Attorney initially refused registration on the sole ground that "the proposed mark, as used on the specimens of record, does not function as a service mark" (the "Failure to Function Refusal"). Examining Attorney's Appeal Brief at 1-2.[2] After that refusal became final, Applicant appealed and briefed the Failure to Function Refusal, following which the Examining Attorney requested and was granted a remand to issue a second refusal, that "[t]he mark on the specimens disagrees with the mark on the drawing" (the "Mutilation Refusal").[3] Office Action of September 30, 2013. While the Examining Attorney indicates in his brief that the basis for this alternative refusal is that "the specimen does not show the applied-for mark in the drawing in use in commerce," Examining Attorney's Appeal Brief at 2, it is clear that this refusal is *not* based on a finding that Applicant's  specimens do

---

[1] Application Serial No. 85494703, filed December 14, 2011, based on first use dates of January 30, 1998. Previously, Applicant owned Principal Register Registration No. 2303638 for the same mark for the same services, but that registration was not renewed and expired on July 31, 2010. Applicant's Appeal Brief at 13; Office Action of March 27, 2012.

[2] In the April 23, 2012 Office Action and thereafter, the Examining Attorney indicated that Applicant could seek registration under Section 2(f) of the Act, but that "an allegation of five years' use alone will be insufficient evidence of distinctiveness in this case." Applicant declined to pursue registration under Section 2(f), and contends that doing so is "unnecessary." Applicant's Appeal Brief at 9.

[3] *See* Trademark Manual of Examining Procedure ("TMEP") § 807.12(d) (2014) and cases discussed therein.

not show proper service mark use, but instead on a determination that the mark in the drawing is not a substantially exact representation of the mark in use, as shown by the specimens, because the Examining Attorney cites Trademark Rule 2.51(a) and TMEP § 807.12(a) (2014) in support of the Mutilation Refusal. *See also* TMEP 807.12(d). Following issuance of the alternative refusal, Applicant supplemented its opening brief to address that refusal, following which the Examining Attorney filed his brief and Applicant filed its Reply Brief addressing both refusals.

## The Specimens

During prosecution, Applicant submitted a number of purported specimens of use of its mark, but because some of them were not supported by the required declaration, the Examining Attorney found that "[t]he *only* acceptable specimens," *i.e.* the only specimens which could be considered, "are the specimens submitted on December 14, 2011, and January 8,

2013." Examining Attorney's Appeal Brief at 6 (emphasis in original). Applicant submitted the December 14, 2011 specimen with the involved application. It depicts Applicant's monster truck bearing the proposed mark during a performance, as shown at right.



Applicant submitted the January 8, 2013 specimens in response to an Office Action, including this photograph of Applicant's monster truck at another performance:

3



and this advertising poster:



## The Failure to Function Refusal

The Examining Attorney argues that the proposed mark "will not be perceived as [a] source indicator for the services" because "monster trucks normally appear in a wide variety of designs." Examining Attorney's Appeal Brief at 5. The Examining Attorney specifically relies on two Internet image searches for "monster truck" which revealed small and partially illegible photographs of monster trucks with various themes and designs; one set of search results includes 55 photographs or other depictions and the other includes 62 photographs or other depictions. The following is a representative sampling:



Office Action of March 27, 2012 (printout from "startpage.com"); Office Action of April 11, 2014 (printout from "bing.com"). While several of the vehicles are apparently depicted in the search results more than once, such as the Batman and Monster Energy monster trucks, there is no dispute and Applicant admits "that monster trucks appear in a wide variety of designs." Applicant's Reply Brief at 3.

The search results do not reveal any monster trucks with unambiguous dinosaur or "fanciful, prehistoric animal" designs or themes. However, the Swamp Thing monster truck has large teeth, and may convey the impression of some type of animal, perhaps reptilian:



Similarly, a monster truck which may have a name including the word "Raptors" has large teeth and, while its theme is ambiguous, it could potentially be perceived as some type of prehistoric animal:[4]

---

[4] It is clear that some of the monster trucks included in the search results perform in other countries, and there is no evidence that either Swamp Thing or the "Raptors" monster truck has performed in the United States. Nevertheless, we assume for purposes of this decision only that all of the trucks revealed by the Examining Attorney's searches have performed in the United States. As a general matter, however, evidence which does not relate to use of a mark in the United States may be given no consideration.



The Examining Attorney argues that Applicant's proposed mark is trade dress which is not inherently distinctive because it is just "one of many interesting monster truck designs in which the applicant admits monster trucks appear." Examining Attorney's Appeal Brief at 6-7. In other words, "the proposed mark, as used on the specimens of record, does not function as a service mark to identify and distinguish applicant's services from those many other monster truck designs and to indicate the source of applicant's services." *Id.*at 7.[5]

Applicant argues that its mark "may well have a visually interesting appeal …. But that is no reason to disqualify it from *also* functioning to distinguish applicant's services." Applicant's Appeal Brief at 4 (emphasis in original). Applicant points out that its "fanciful, prehistoric animal" design mark is used with its word mark JURASSIC ATTACK,[6] and argues that "[t]he two together convey a theme that

---

[5]  At times, the Examining Attorney referenced "ornamentation" in the context of the Failure to Function Refusal. However, an ornamentation refusal would generally apply only to trademarks as opposed to service marks such as Applicant's, TMEP § 1202.03 (2014), and in any event the stated basis of the refusal is that the "fanciful, prehistoric animal" design does not function as a service mark because it is not inherently distinctive.

[6] Applicant claims to own a registration for JURASSIC ATTACK (Registration No. 4185999), Applicant's Appeal Brief at 19, but failed to make the alleged registration of

reinforces the distinctive character of applicant's mark and makes even more memorable in the minds of ordinary purchasers the association between applicant's three dimensional mark and the entertainment services originating with applicant." Applicant's Appeal Brief at 4-5. Furthermore, Applicant's monster truck's body "is suggestive of prehistoric animals but does not look like any one such animal." *Id.* at 7. Finally, Applicant claims that its monster truck includes "such extreme visual features … to distinguish applicant from other monster truck operators," not only to sell tickets to performances, "but also to promote sales of associated products such as shirts and caps and toy model monster trucks." *Id.* at 8.

A service mark is "any word, name, symbol, or device, or any combination thereof … [used] to identify and distinguish the services of one person … from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127. A service mark must be "used in such a manner that it would be readily perceived as identifying" the services, which is "determined by examining the specimens of record in the application." *In re Moody's Investors Service Inc.,* 13 USPQ2d 2043, 2047 (TTAB 1989); *see also In re Volvo Cars of North America Inc.,* 46 USPQ2d 1455, 1458 (TTAB 1998) (a mark "must be used in a manner calculated to project to purchasers or potential purchasers a single source or origin" for the services, but mere intent that it function as a mark is not sufficient); *In re Duratech Industries Inc.,* 13 USPQ2d 2052 (TTAB 1989).

---

record. In any event, it is clear from the specimens that Applicant's monster truck bears this word mark.

Although the Examining Attorney did not explicitly address the issue in his brief, it is apparent from the prosecution history that at least one reason he found that Applicant's mark does not function as a service mark is that it is not inherently distinctive. Office Action of April 23, 2012 ("the proposed mark is not inherently distinctive … if applicant believes that its mark has acquired distinctiveness, that is, that it has become a distinctive source-indicator for the goods and/or services, applicant may seek registration on the Principal Register under Trademark Act Section 2(f)"); Office Action of February 6, 2013; *cf. Seabrook Foods, Inc. v. Bar-Well Foods Limited*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977) ("The board did not comment on whether it considered Seabrook's design inherently distinctive, although, from its decision to dismiss the opposition, it evidently was not persuaded that the design makes such an impression on consumers that they will assume Seabrook to be the source of the goods upon seeing a similar design on identical or closely related goods.").

The basis for the Examining Attorney's theory that the proposed mark is not inherently distinctive is not clear from the record. However, it is settled that while trade dress in the nature of product design can never be inherently distinctive, product packaging trade dress and trade dress for services can be inherently distinctive. *Compare Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068-69 (2000) ("[product] design, like color, is not inherently distinctive … consumer predisposition to equate the feature with the source does not exist"), *with Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 23 USPQ2d 1081, 1084 (1992) ("There is no persuasive reason to apply to trade dress a general

9

requirement of secondary meaning ….”). To the extent that the Failure to Function Refusal was based on a conclusion that Applicant's mark is analogous to product design, as opposed to trade dress for services such as in *Two Pesos*, we disagree.

Applicant does not seek registration of its design for a *product*, it seeks registration of its “fanciful, prehistoric animal” design for its monster truck exhibition *services*, and under *Two Pesos*, trade dress for services may be inherently distinctive. *See, In re Chippendales USA, Inc.*, 622 F.2d 1346, 96 USPQ2d 1681, 1684 (Fed. Cir. 2010) (“Cuffs & Collars” costume worn by Chippendales dancers found to be trade dress which could be inherently distinctive for “adult entertainment services, namely exotic dancing for women”); *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F.Supp.2d 60 (S.D.N.Y. 2003) (finding interior décor of retail wine store inherently distinctive). Indeed, Applicant's service is exhibiting its monster truck in action, such as doing wheelies, jumping over and crushing smaller vehicles and otherwise entertaining fans with the truck's size, power and sheer awesomeness,[7] which could be performed with or without the “fanciful, prehistoric animal” design on the outside of the truck, just as Taco Cabana's service of offering Mexican food to restaurant customers could be performed without the particular interior design found to be inherently distinctive in *Two Pesos*. Like the “Cuffs & Collars” costume worn by Chippendales dancers, the “fanciful, prehistoric animal” design is akin to the packaging of what is being sold, in this case Applicant's monster truck services. *In re Chippendales*, 96 USPQ2d at 1684.

---

[7] Office Action of April 11, 2014 (“bing.com” printout depicting the Nitro Circus, Instigator and Maximum Destruction monster trucks jumping and crushing); Applicant's specimen of December 14, 2011 (depicting Applicant's truck doing a wheelie).

Having determined that Applicant's design constitutes trade dress for its services capable of inherent distinctiveness, we must next determine whether that trade dress is in fact inherently distinctive. "The facts of each case dictate that determination," and "[t]he Examining Attorney need only establish a 'reasonable predicate' to make the necessary *prima facie* showing." *In re Chippendales USA, Inc.*, 90 USPQ2d 1535, 1539-40 (TTAB 2009), *aff'd*, 622 F.2d 1346, 96 USPQ2d 1681 (Fed. Cir. 2010).

There is a "four-part test for determining the inherent distinctiveness of trade dress," as follows:

> [1] whether it was a 'common' basic shape or design, [2] whether it was [not] unique or unusual in the particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Id.* (quoting *Seabrook*, 196 USPQ at 291). As we have previously pointed out, one prominent commentator has opined that all parts of this test "are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:13 (4th ed. 2014); *see In re Hudson News Co.*, 39 USPQ2d 1915, 1922 n.15 (TTAB 1996). *See also In re Procter & Gamble*, 105 USPQ2d 1119, 1122 (TTAB 2012) (product packaging trade dress found inherently distinctive).

Here, the evidence made of record by the Examining Attorney fails to show that Applicant's "fanciful, prehistoric animal" design is either a common or a basic shape or design. Rather, it is unique among the more than 100 monster trucks depicted in the Examining Attorney's image search results. To the extent that two of the monster trucks among those results have certain characteristics in common with Applicant's mark, they are nevertheless readily distinguishable from Applicant's unique design which includes peculiar horns, scales, a protective shield and other features which neither Swamp Thing nor the "Raptors" monster trucks share. Indeed, Applicant's monster truck is "unique" and "unusual" in the monster truck field. The Examining Attorney provided scant, if any, evidence that Applicant's truck is a "mere refinement" of anything, let alone a "commonly-adopted" and "well-known form" in the monster truck field. To the contrary, the totality of the record makes clear that Applicant's truck stands alone in the quality and quantity of its distinctive traits which set it apart from the other monster trucks about which the Examining Attorney submitted evidence, as the body of Applicant's truck is cut and molded to convey the body of a dinosaur and adorned with other dinosaur elements, including horns, a protective shield and eyes bordered by scales. These elements are unique and make Applicant's truck unlike any of those included in the Examining Attorney's search results.

Finally, Applicant's mark is fully capable of creating a commercial impression distinct from the words JURASSIC ATTACK. Indeed, in this case, Applicant's "fanciful, prehistoric animal" three-dimensional design mark predominates over the words, which only appear on a small portion of the side of the back of Applicant's

truck. By contrast, the design elements encompass the entire truck cab and the scales are painted on the bed of the truck. And when the truck is viewed from the front, the words are not visible, while the prehistoric animal design is manifest. The horns protruding from the front and top of the truck are themselves as large or larger than the words, and the truck's "eyes" draw immediate attention and convey a representation of a prehistoric animal. In short, the three-dimensional design creates a commercial impression distinct from the words. It is not "mere" background material, and stands on its own. *See generally In re E.J. Brach & Sons*, 256 F.2d 325, 118 USPQ 308, 309 (CCPA 1958) (stating, in dicta, "it must be made clear that it is not every case in which the background display of a mark is sought to be registered apart from the word mark with which it is associated that secondary meaning must be shown. It is only in those cases where what is sought to be registered is '*mere* background material' that this holds true."); *In re National Institute for Automotive Service Excellence*, 218 USPQ 744, 745 (TTAB 1983).

As to the Examining Attorney's argument that the specimens do not "show the crucial link between the likely perception of the proposed mark … as a service mark indicating that the proposed mark indicates the source of the services,"[8] we do not consider this to be an argument that the specimens do not function as proper service mark specimens, which is not the refusal before us; rather, we consider it to be an argument that even when used in the advertising of monster truck events, the image of Applicant's truck does not function as a mark. We find, however, based on the advertising poster specimen, that Applicant's distinctive design mark would be

---

[8] Examining Attorney's Appeal Brief at 7.

"readily perceived as identifying" Applicant's monster truck services. The poster is for a motor sports show featuring not only Applicant's truck, but also the Maniac, UnNamed and UnTamed, Nasty Boy and McGruff monster trucks, lawn mower racing and freestyle motocross. But it is Applicant's truck which is most prominently featured on the poster, with Applicant's "fanciful, prehistoric animal" design mark immediately drawing consumers' eyes and attention, and being significantly larger than and dominating over the JURASSIC ATTACK word mark in both places it appears. It is clear to consumers viewing the poster that what is most prominently depicted is not just *any* monster truck, but *Applicant's* distinctive monster truck. The name of the truck is easily discernible upon close review of the poster, but it is the image that dominates. The advertising poster is analogous to a music festival advertisement listing several acts, but most prominently featuring the headliner, and in this case, rather than most prominently identifying the "headliner" by its name/word mark, the poster most prominently displays Applicant's "fanciful, prehistoric animal" design mark. That design identifies and will be perceived as identifying Applicant's particular monster truck exhibition services, not generic monster truck exhibition services. Unlike the lawn mower racing events promoted generically in the advertisement, the particular monster trucks performing are listed specifically, by name, and, in Applicant's case alone, by the prominent and unmistakable display of Applicant's involved three-dimensional design mark.

As for Applicant's specimens displaying its truck in action at a monster truck event, it is settled that a mark applied to a product can function "not only as

ornamentation for the [product] but also as a mark for applicant's services." *In re Eagle Fence Rentals, Inc.*, 231 USPQ 228, 231 (TTAB 1986); *see also In re Procter & Gamble Co.*, 105 USPQ2d at 1127 ("the bottle design and the cap design are both inherently distinctive, serve primarily as indicators of source, and, to the extent they are decorative or ornamental in nature, are only incidentally so"); *In re Hudson News*, 39 USPQ2d at 1923 ("We readily recognize that there is no prohibition against a trade dress mark both functioning to indicate source and being aesthetically pleasing."). And because two specimens show use of Applicant's mark "in the rendering (i.e., 'sale') of its services," in this case at monster truck performances, they are acceptable and may be perceived as identifying those services. *In re Eagle Fence Rentals*, 231 USPQ at 231; *In re Red Robin Enterprises, Inc.*, 222 USPQ 911, 912 (TTAB 1984) ("we see no reason why a costume design cannot function as a service mark and, in addition, cannot so function while being worn by an individual who is either soliciting or advertising such services *or actually performing them*") (emphasis added).

As indicated, while an ornamentation refusal would ordinarily only apply to goods rather than services, during prosecution and in his Appeal Brief the Examining Attorney appears to have implied, but later denied, that "ornamentation" was a basis for the refusal. *Compare* both the Office Action of April 23, 2012 ("Unlike the costume in [*Red Robin*], the proposed mark is not a costume in which a performer personally wears or wears when interacting with customers. Instead the proposed mark is a design that is affixed to the truck driven by a driver.") and the Examining Attorney's Appeal Brief at 7 ("Because monster truck

customers are conditioned to seeing what the applicant admits are a wide variety of truck (sic) monster truck designs that may be mere ornamentation, there is nothing in the specimens that makes the crucial change between the likely perception that the proposed mark is just one of many monster truck designs and a mark that indicates that applicant is the source ....") *with* the Office Action of September 17, 2012 ("the applicant's desire to turn the refusal into an 'ornamental' refusal is misguided") and Examining Attorney's Appeal Brief at 9 ("the applicant creates a straw man argument that the refusal is based on the proposed mark being ornamental. The issue is not whether the proposed mark is ornamental ...."). While use of the term of art "ornamentation" may have caused some confusion during prosecution of the application, it is clear that the refusal is not based on "ornamentation," notwithstanding that there are "a wide variety of monster truck designs" and the proposed mark is "a design that is affixed to the truck driven by a driver." Applicant does not seek to register its mark for a toy or model truck, or any other product, but instead for monster truck exhibition services. That those services are performed by a "truck driven by a driver" bearing one of many monster truck designs is not a basis for refusing registration here, where Applicant's advertising poster and other specimens establish that its distinctive "fanciful, prehistoric animal" design mark would be perceived as identifying Applicant's monster truck exhibition services.

Ample precedent makes clear that despite monster trucks appearing in a variety of designs, Applicant's mark may still be inherently distinctive, different from the rest and readily perceived as identifying Applicant's services. For example,

in *Red Robin*, we reversed a failure to function refusal in finding the design of a bird costume to be inherently distinctive and registrable on the Principal Register for "entertainment services, namely personal appearances, clowning, antics, dance routines and charity benefits." In *Eagle Fence* we reversed a failure to function refusal in finding "alternately colored strands of wire arranged vertically" in fencing inherently distinctive and registrable on the Principal Register for renting chain-link fences, and in doing so pointed out that "[t]he Lanham Act takes a very flexible approach to the question of what constitutes a service mark." *In re Eagle Fence*, 231 USPQ at 230. And the predecessor to our primary reviewing court reversed a failure to function refusal to register "polka dot banding" applied to cans containing a household cleanser, finding that it "is an artistic and unique design or pattern which may be constituted a trademark 'device' within the meaning of Section 45." *In re Swift & Co.*, 223 F.2d 950, 106 USPQ 286, 288 (CCPA 1955). *See also In re DC Comics, Inc.*, 689 F.2d 1042, 215 USPQ 394 (CCPA 1982) (reversing failure to function refusal to register drawings of Superman, Batman and the Joker used on product packaging for toy dolls).

The specimens and record as a whole make clear that Applicant's three-dimensional mark in this case is akin to the marks found registrable in *Two Pesos*, *Red Robin*, *Eagle Fence* and similar cases. It is nothing like the "quite pedestrian" and "commonplace interior decorating features" at issue in *Hudson News*, the Cuffs & Collar trade dress at issue in *Chippendales* which derived directly from "the pervasive Playboy mark, which includes the cuffs and collar together with bunny

ears,"[9] or the mere "refinement of the commonplace decorative or ornamental [bowling alley] lighting arrangements" at issue in *In re File*, 48 USPQ2d 1363 (TTAB 1998).

The Federal Circuit made clear in *Chippendales*, even as it affirmed a refusal to register the Cuffs & Collar trade dress, that merely because costumes used in a particular field may be a common occurrence, that does not preclude the possibility of some of them serving as marks. The Court's affirmance was based on evidence that the Cuffs & Collar derived from the "pervasive" Playboy bunny costume. But the Court limited another of the Board's holdings, specifically finding that "the Board erred … to the extent that it suggested that *any* costume would lack inherent distinctiveness in the context of the live adult entertainment industry." *In re Chippendales*, 96 USPQ2d at 1687. In fact, the Court stated that "[s]imply because the live adult entertainment industry generally involves 'revealing and provocative' costumes does not mean that there cannot be any such costume that is inherently distinctive." In other words, the Examining Attorney's reliance on the mere fact that "monster trucks normally appear in a wide variety of designs," Examining Attorney's Appeal Brief at 5, does not end the inquiry. According to *Chippendales*, that Applicant admitted this factual contention of the Examining Attorney does not mean that there cannot be any inherently distinctive monster truck design.

Here, the Examining Attorney's evidence reveals that while monster trucks appear in a wide variety of designs, many of which are menacing or theatrical, Applicant's design is quite unique, comprising particular scales, horns, a protective

---

[9] *In re Chippendales*, 96 USPQ2d at 1688.

shield and other "fanciful, prehistoric animal" features, including a body molded to convey a dinosaur's body, which are anything but "pedestrian" or "commonplace" in the monster truck field. In short, the Examining Attorney has failed to make of record any monster truck design that includes the distinctive features encompassed within Applicant's mark, or for that matter anything like them. Accordingly, he has not set forth a "reasonable predicate" for his finding that Applicant's mark is not inherently distinctive, nor has he demonstrated that Applicant's mark will not be readily perceived as indicating the source of Applicant's monster truck services. *In re Procter & Gamble*, 105 USPQ2d at 1125-26.

## The Mutilation Refusal

The Examining Attorney argues that the specimens do not depict Applicant's applied-for mark in use in commerce, because they display the mark "<u>with</u> the wording JURASSIC ATTACK and/or other additional markings (e.g., stylized gills or stripes, peacock tail like design behind the truck cab, etc.); and the drawing shows the mark without the wording JURASSIC ATTACK and/or other additional markings." Examining Attorney's Appeal Brief at 8 (emphasis in original). Furthermore, "amending the mark in the drawing to conform to the mark on the specimen would be a material alteration and would not be accepted, because the difference between the mark in the specimen and the drawing is significant and each mark creates a different commercial impression." *Id.* at 9.

Applicant argues that the drawing must display a substantially exact representation of the mark in the specimens, which in this case is "the design of applicant's truck body." Applicant's Supplemental Appeal Brief at 1. Applicant

19

claims that its truck bears a composite mark with "two or more separable elements," and argues that its drawing may show "less than the entire composite mark." *Id.* at 2.

We agree with Applicant. We begin by recognizing that Applicant "has some latitude in selecting the mark it wants to register." *In re 1175856 Ontario Ltd.*, 81 USPQ2d 1446, 1448 (TTAB 2006). More to the point with respect to the refusal,

> it is settled that when a background design used for the display of a word or letter mark is sought to be registered by itself, without the word or letter mark, the design may be registered without any evidence of secondary meaning if it is distinctive or unique enough to create a commercial impression as an indication of origin separate and apart from the remainder of the mark; conversely, if it is not distinctive or unique enough to create a separate commercial impression as a trademark, it may be registered only upon proof of secondary meaning.

*In re National Institute for Automotive Service Excellence*, 218 USPQ at 745. As we found in connection with the Failure to Function Refusal, Applicant's three-dimensional "fanciful, prehistoric animal" design mark is distinctive, unique and creates a commercial impression as an indication of origin separate and apart from the word mark JURASSIC ATTACK. The three-dimensional mark predominates over the words JURASSIC ATTACK, which only appear on a small portion of the side of the back of Applicant's truck and depending on the viewing angle, the words may not even be visible. The three-dimensional mark is so prominently promoted on the advertising poster specimen precisely because it is so distinctive, and the Examining Attorney has not established that it is anything other than unique in the monster truck industry. The "fanciful, prehistoric animal" design is anything

but "mere" background material. *See generally In re E.J. Brach & Sons*, 118 USPQ at 309 (CCPA 1958). Applicant's mark

> is not a common basic shape; it creates a visual impact separate and apart from the words superimposed thereon (indeed, at a distance the words may be hard to read but the design stands out and provides a means of ready recognition) … and there is no evidence that similar designs have been commonly used in the field. Under these circumstances … it is registrable without the words.

*In re National Institute for Automotive Service Excellence*, 218 USPQ at 745.

We do not share the Examining Attorney's concern with the "additional markings (e.g., stylized gills or stripes, peacock tail like design behind the truck cab, etc.)." The specimens submitted on January 8, 2013 include the "peacock tail like design behind the truck cab," and to the extent we understand what the Examining Attorney means by "stylized gills or stripes," we believe that any differences between these features as they appear in the drawing and the specimens are but "minor alterations," and they do "not create a new and different mark creating a different commercial impression." *In re Schecter Bros. Modular Corp.*, 182 USPQ 694, 695 (TTAB 1974). Finally, while *some* of the specimens reveal a relatively small yellow oval PENNZOIL sticker on the side of the truck, as Applicant points out, such use of third-party marks is a convention in the motor sports industry, and would not be perceived as part of Applicant's mark.[10]

---

[10] Because Applicant's mark does not include a color claim, the fact that different colors are used in the various specimens is irrelevant.

## Conclusion

Applicant's three-dimensional "fanciful, prehistoric animal" design mark has not been shown to be lacking distinctiveness; to the contrary, on this record it passes the *Seabrook* test for inherent distinctiveness. It also creates a separate commercial impression from the words JURASSIC ATTACK, and would be readily perceived as identifying Applicant's monster truck services.

*However*, while Applicant's inherently distinctive mark encompasses the painting and design on the outside surface of the truck's bed, the truck's bed itself must, like the truck's wheels and underbody, appear in dotted lines in the drawing of the mark. TMEP § 1202.02(c)(i). Accordingly, Applicant is allowed until 30 days from the mailing date of this order to submit an amended drawing of its mark in which the truck's bed appears in dotted lines.

*Decision*: Both the Failure to Function Refusal and the Mutilation Refusal are reversed.