This Opinion is a
Precedent of the TTAB

Mailed: September 30, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Odd Sox LLC*

_____

Serial No. 86297488

_____

Brittany J. Maxey of Maxey Law Offices PLLC for Odd Sox LLC.

Tara L. Bhupathi, Trademark Examining Attorney, Law Office 124,
Lydia Belzer, Managing Attorney.

_____

Before Kuhlke, Ritchie and Larkin,
Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Odd Sox LLC ("Applicant") seeks registration on the Principal Register of the

mark shown below for "socks," in International Class 25.[1]

---

[1] Application Serial No. 86297488 was filed on June 2, 2014, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based upon Applicant's allegation of use and first use in commerce at least as early as December 31, 2013.



The application includes the following description of the mark:

> The mark consists of a three-dimensional configuration of product packaging for displaying a single pair of socks hanging side by side. The socks are displayed in a manner in which the toe of the sock is flattened and faces forward from an elongated rectangular packaging design. The broken lines depicting two socks hanging side by side shows the placement of the Mark. The hook element, the two fasteners and the vertical lines representing ribbing on the socks are not part of the mark.

The Trademark Examining Attorney issued a final refusal of registration of Applicant's packaging trade dress under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052 and 1127, on the grounds that Applicant's trade dress "consists of a generic configuration of packaging, or, in the alternative, consists of a non-inherently distinctive configuration of packaging." 16 TTABVUE 2.[2]

The case is fully briefed. We affirm both refusals to register.

---

[2] When the refusal was originally made final, Applicant appealed and filed a brief. Thereafter, upon the Examining Attorney's request, the Board remanded the application, which resulted in the refusal based on incapability as generic trade dress and further amendments to the description of the applied-for trade dress. After the application was returned to the Board, upon Applicant's request, the Board remanded the application to the Examining Attorney once again, this time for reconsideration of her final refusal. After the Examining Attorney denied the request for reconsideration, the Board resumed proceedings and allowed Applicant time to file a supplemental brief, which it filed.

## I.    Basis of Refusals

The statutory basis for the refusals to register falls under Trademark Act Sections 1, 2 and 45. Sections 1 and 2 of the Trademark Act require that the subject matter presented for registration be a "trademark" as defined by Section 45 of the Act.[3] As noted above, the Examining Attorney asserts two grounds for refusing registration. The first is that the trade dress is incapable of functioning as an indicator of source because it is generic. *See Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 50 USPQ2d 1532, 1535 (Fed. Cir. 1999); *see also Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549 (TTAB 2009); TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1202(b)(ii) (Oct. 2018). The second is, in the alternative, that the trade dress is sufficiently common that it is not inherently distinctive and not registrable on the Principal Register without sufficient proof of acquired distinctiveness. *See In re Pacer Tech.*, 338 F.3d 1348, 67 USPQ2d 1629, 1631 (Fed. Cir. 2003) (citing *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977)); *In re Procter & Gamble Co.*, 105 USPQ2d 1119, 1121-22 (TTAB 2012). Regarding the second refusal, Applicant contends that its applied-for trade dress is inherently distinctive and does not claim, in the alternative, that its trade dress has acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

---

[3] "[A]ny word, name, symbol, or device, or any combination thereof (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods … from those manufactured or sold by others and to indicate the source of the goods."

## II.  The Applied-for Trade Dress and Evidence of Third-Party Use

Because the evidence in support of both grounds for refusal is the same, we begin with a review of the record, including evidentiary objections raised and discussed by Applicant and the Examining Attorney. Applicant's applied-for packaging trade dress consists of an elongated rectangle from which hangs a single pair of socks with the toes flattened facing forward hanging side-by-side. We further observe that the packaging may serve the practical purpose of displaying a feature of the product as illustrated by Applicant's use shown below, where the side-by-side orientation reveals that when put together the socks complete a single image; although this aspect of the packaging design is not part of the drawing or mark description, it is relevant to the analysis of limited possibilities for competitors discussed below:[4]

---

[4] Applicant's specimen of use submitted with its June 2, 2014 Application; October 27, 2015 Response at 4. Page references to the application record refer to the USPTO's Trademark Status & Document Retrieval (TSDR) system.



In support of the refusal, the Examining Attorney submitted evidence in the form of screen prints from third-party websites offering and displaying socks for sale or providing information for retailers on how to display socks, all showing socks hanging from various rectangular holders, many in the side-by-side orientation. A few examples are reproduced below:



October 17, 2016 Office Action at 6 (https://www.thehunt.com)



March 23, 2015 Office Action at 34 (http://www.eroswholesale.com)



October 17, 2016 Office Action at 2 (geb.ebay.in)



October 17, 2016 Office Action at 3 (www.google.com/…www.ebay.it)



October 17, 2016 Office Action at 4 (www.google.com…www.ebay.com)



October 17, 2016 Office Action at 5 (www.ebay.tv)



October 17, 2016 Office Action at 7 (geb.ebay.in)



October 17, 2016 Office Action at 8 (https://guide.alibaba.com)



October 17, 2016 Office Action at 11 (https://guide.alibaba.com)



May 11, 2017 Office Action at 2 (www.alibaba.com)



May 11, 2017 Office Action at 4 (www.shoparthurgeorge.com)



March 23, 2015 Office Action at 33 (http://www.horror-hall.com)



November 25, 2014 Office Action at 2 (http://www.nonslipgripsocks.com)[5]

Applicant discounts this evidence, arguing that "[a]ll but two (2) of the twenty-nine (29) examples included within the chart fail to show **both** an elongated rectangular packaging and a **single** pair of socks hanging side by side." App. Supp. Br. 14 TTABVUE 10 (emphasis added). Of the two remaining examples, Applicant asserts that one is a counterfeit item which serves to support the uniqueness of Applicant's mark and the other is from eBay India, a foreign website, which is not probative of U.S. consumer perception. *Id.* at 15-18.

The example submitted by the Examining Attorney that Applicant characterizes as a "knock-off [of] Applicant's goods," 14 TTABVUE 15, is shown below:[6]

---

[5] While this example does not show front-facing pairs of socks it does add to the examples of socks hanging from a rectangular piece.

[6] March 23, 2015 Office Action at 32 (http://www.aliexpress.com).



Applicant points to the bottom of the page on this excerpt that references the style

of these socks as "ODD SOX."[7]

| Item specifics | |
| --- | --- |
| Item Type: | Sock |
| Gender: | Men |
| Sock Type: | Casual |
| Brand Name: | FASHION-TEE |
| Material: | Cotton,Poly,Spandex |
| Thickness: | Standard |
| Model Number: | Y043 |
| Season: | 2015 |
| Style: | ODD SOX |

---

[7] *Id.*

In addition, as shown below[8] Applicant submitted other excerpts from this website showing the same manufacturer offering "a whole category of goods where the counterfeit socks are sold as 'ODD Style Socks.'" 14 TTABVUE 16.



[8] June 3, 2015 Response at 10-11, 22 (www.aliexpress.com).

Applicant explains that "[t]he AliExpress seller for this piece of evidence is Nanchang Fashion-Tee T-shirt Factory Store (hereinafter 'Nanchang') from China. The piece of evidence from page 38 of the March 2015 Office Action … references the style of the socks as 'ODD SOX,' referencing Applicant Odd Sox LLC …. A review of Nanchang's on-line store shows a whole category of goods where the counterfeit socks are sold as 'ODD Style Socks. … [T]he counterfeit product has copied the entire look and feel of Applicant's product packaging, as well as copies of Applicant's photographs of its own Goods. Under the 'Item specifics', the style of the single pair of socks is listed as 'ODD SOX'." 14 TTABVUE 15-16. Applicant argues that the existence of these "counterfeit goods under the style of 'Odd Sox' supports Applicant's position that Applicant's Mark 'is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicia of origin – a trademark.'" 14 TTABVUE 17-18 (quoting *Procter & Gamble Co.*, 105 USPQ2d at 1122).

The Examining Attorney argues that:

> [T]here is no evidence of cease and desist letters or actions against the alleged infringing user. A finding that the use is infringing or counterfeit is a conclusion of law, not a statement of fact that can be relied upon solely based on the verification of applicant's attorney, as argued by applicant. … Second, applicant argues that the infringing use supports a finding that the mark is unique because the AliExpress evidence lists ODD SOX as the style of the socks. … However, it is plausible that "style" refers to the brand of the socks and the website is re-selling applicant's goods or that "style" refers to the style of the socks themselves. … [E]ven if the evidence does show use of the same product packaging and is attributed to applicant, such evidence does not prove that the packaging is unique.

> Mere evidence of copying does not prove distinctiveness. … Here, applicant attempts to use the AliExpress evidence to show the mark is unique and the examining attorney disagrees as applicant does not point to any precedent showing that evidence of copying is probative on the issue of distinctiveness. Even if copying is probative, one example is insufficient to establish inherent distinctiveness.

16 TTABVUE 15-17.

Applicant first responds that its counsel "on behalf of Applicant and as Applicant's signatory, attested to the truth and accuracy of the statements in said Response" and this is sufficient to prove that the evidence "displays a counterfeit of Applicant's Mark and Applicant's goods." 14 TTABVUE 17. Second, Applicant responds that it has not argued that this evidence of copying proves distinctiveness but simply that it "further exemplifies that Applicant's Mark is so unique and unusual in Applicant's industry that the Mark is inherently distinctive … that Applicant's Mark is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicia of origin – a trademark." *Id.* at 16-17.

As to Applicant's first contention, the Response includes a declaration under Trademark Rule § 2.20, 37 C.F.R. § 2.20, and is, therefore, acceptable as a sworn statement. We accept this statement as Applicant's view, rather than a legal conclusion, but not as established fact. As to Applicant's second contention that "the counterfeit goods under the style of 'Odd Sox' further exemplifies that Applicant's mark is so unique and unusual in Applicant's industry that the Mark is inherently distinctive" (14 TTABVUE 17), this is not the case.

What appears on the AliExpress site includes arguably source-identifying wording, ODD SOX, along with the depiction of the goods and trade dress packaging. Because the copying in these instances is not limited to the applied-for trade dress alone, it does not show that the copier perceived the trade dress by itself as a source indicator or believed that consumers would rely on the trade dress alone as an indicator of the source of the goods. *In re Fantasia Distrib., Inc.*, 120 USPQ2d 1137, 1145-46 (TTAB 2016); *see also Kohler Co. v. Honda Giken Kogyo K.K.,* 125 USPQ2d 1468, 1518 (TTAB 2017) (copying of trade dress may not be probative of anything where it is not clear what features were copied). As explained in *In re Ennco Display Sys., Inc.*, 56 USPQ2d 1279, 1286 (TTAB 2000):

> In regard to other evidence of acquired distinctiveness, we are not convinced that competitors intentionally copied the subject configurations to trade on applicant's asserted distinctiveness as the source of the products. Applicant has not presented any concrete evidence of intentional copying. In any event, it is more common that competitors copy product designs for desirable qualities or features. *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 36 USPQ2d 1065 (7th Cir. 1995) (copying product shape for useful features not evidence of acquired distinctiveness[)]; *Cicena, Ltd. v. Columbia Telecomm. Grp.*, 900 F.2d 1546, 1551-52, 14 USPQ2d 1401, [1407] (Fed. Cir. 1990) (product copying based on desire to capitalize on the "intrinsic consumer-desirability" of the product not evidence of acquired distinctiveness).

In the context of this ex parte proceeding, the record is insufficient to show that AliExpress intended to copy Applicant's trade dress for the purpose of confusing consumers and passing off its own products as those of Applicant—the kind of copying that may evidence distinctiveness. *In re Koninklijke Philips Elecs. N.V.*, 112 USPQ2d 1177, 1187 (TTAB 2014). Even if AliExpress intentionally copied Applicant's applied-

for trade dress and the mark ODD SOX, the evidence is insufficient to establish that the applied-for trade dress alone serves to identify the source of the goods. Nor is there any evidence that Applicant has attempted to stop any such alleged misuse, or to enforce its claimed trademark rights against these or any other third parties. *Id.*

As to the probative value of this evidence to support the position that the trade dress is generic or not inherently distinctive, the Examining Attorney "concede[d] that … its probative value … is unclear." 16 TTABVUE 17. The Board also finds this evidence sufficiently questionable as an example of third-party use. In short, we do not consider this example probative in determining whether or not Applicant's trade dress is distinctive.

Turning to the eBay India screen print shown below,[9] Applicant argues that it cannot serve to show U.S. consumer perception because it is from a foreign website, but that it does serve as an example that "demonstrates the fact that Applicant's mark is unique, unusual, and functions as a trademark as to the source of Applicant's Goods." 14 TTABVUE 18.

---

[9] October 17, 2016 Office Action at 2 (geb.ebay.in).



Applicant provided its own screen print of this web page to further support that it is from eBay India, as shown below:[10]



Applicant argues that although English-language material obtained from foreign websites has been accepted as competent evidence in trademark examination when

---

[10] April 13, 2017 Response at 11 (geb.ebay.in).

it is likely that U.S. consumers have been exposed to the website, in this case it is not

probative. Specifically, Applicant contends:

> While the foreign website in this case is in English, the website is located at the ".in" TLD, [sic] are related to consumer goods readily available in the United States and from websites located at ".com" TLDs, and the cited reference was a fleeting auction available for a very limited time period. Furthermore, Applicant's Mark does not include a word element that would be searched by consumers. The Examining Attorney's search string of "packaging socks side by side" is not a common search string that would be used by consumers to find socks, unless they were familiar with Applicant's Mark, because it is related to the packaging rather than any feature of the socks themselves. Due to these factors, it is highly unlikely a consumer in the United States would have been exposed to this foreign reference.

14 TTABVUE 19-20.

The Examining Attorney responds that:

> First, the examining attorney notes that the eBay India evidence shows that the seller is located in Saint Paul, Minnesota. Applicant's 4/13/2017 Response, pg. 11. This argues against the TLD being a factor in whether or not a US consumer will go to a website and is direct evidence showing that US residents do go to the precise foreign website.
>
> Second, the relevancy of the goods being available in the United States is not clear. There is no evidence of record that suggests that consumers enter searches that restrict the results to only US sellers and gTLDs. A general search will search the entire World Wide Web, including websites in other countries. *See In re King Koil Licensing Co.*, 79 USPQ2d (BNA) 1048, 1050 (Trademark Trial & App. Bd. March 2, 2006) (stating that "[w]e therefore disagree with applicant's essential contention that a general consumer in the United States would not turn to foreign web sites when researching products they may be planning to purchase. Such consumers may visit foreign web sites for informational purposes, even if they are more likely to

> focus on internet retailers that can easily ship items or make items available for pick up in a store in a location convenient to the purchaser.")
>
> Third, it is true that consumers would not search "packaging socks side by side" when looking to purchase socks. However, a search of "girls socks" would likely result in finding the eBay India evidence because the wording is used on the webpage to identify the goods.

16 TTABVUE 18-19.

It is settled that "[i]nformation originating on foreign websites or in foreign news publications that are accessible to the United States public may be relevant to discern United States consumer impression of a proposed mark." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1835 (Fed. Cir. 2007). The probative value of foreign information sources is evaluated on a case-by-case basis. *Id.* "Various factors may inform the probative value of a foreign website in any given case, such as whether the website is in English (or has an optional English language version), and whether the nature of the goods or services makes it more or less likely that U.S. consumers will encounter foreign websites in the field in question." *In re Well Living Lab Inc.*, 122 USPQ2d 1777, 1782 n.10 (TTAB 2017).

Here, the foreign website geb.ebay.in is in English, the item for sale is located in Saint Paul, Minnesota, and it is the type of good that a U.S. consumer might seek from this website. That the Examining Attorney's search looked for a specific type of packaging does not mean this website would not be returned in a search for "girl's socks" as explained by the Examining Attorney. While we have considered this evidence, the result would be the same without it, given the other evidence and the nature of Applicant's trade dress.

### III. Failure to Function Refusal Under Sections 1, 2 and 45 – Whether the Trade Dress is Generic Packaging

"[T]rade dress that cannot serve as an indicator of source is generic and unprotectable." *Sunrise Jewelry*, 50 USPQ2d at 1535 ("generic name" in Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3), "must be read expansively to encompass anything that has the potential but fails to serve as an indicator of source, such as names, words, symbols, devices, or trade dress."); *see also Nora Beverages Inc. v. Perrier Grp. of Am. Inc.*, 269 F.3d 114, 60 USPQ2d 1038, 1041 (2d Cir. 2001) (affirming the district court's finding that the water bottle manufactured and sold by Nora was generic because "it was used, with minor variations, throughout the entire market of similar products"); *Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 36 USPQ2d 1176, 1180 (2d Cir. 1995) ("[W]here it is the custom in a particular industry to package products in a similar manner, a trade dress done in that style is likely to be generic. In other words, when the possibilities of the ultimate trade dress for a product are limited and the trade dress is therefore in commonplace use, it is unlikely that consumers will view the trade dress as distinctive of the goods or services of a particular seller."); *see also Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 27 USPQ2d 1189, 1193 (2d Cir. 1993).

Generic product packaging is incapable of source identification and cannot be registered. Trademark Act Sections 1, 2 and 45. *Cf. Stuart Spector Designs*, 94 USPQ2d at 1554 (generic product design unregistrable). Our precedent dictates that a product design may be deemed generic where it is, "at a minimum, so common in the industry that it cannot be said to identify a particular source." *Id*. at 1555; *see*

*also Sunrise Jewelry*, 50 USPQ2d at 1535-36 (noting that trade dress can be considered generic if it "consists of the shape of a product that conforms to a well-established industry custom") (citation omitted). We hold that this standard applies equally to product packaging. This standard recognizes the beginning of the *Abercrombie* scale (*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 189 USPQ 759, 764 (2d Cir. 1976) generic, descriptive, suggestive, arbitrary, or fanciful) based on a similar analysis found in the first test for determining the inherent distinctiveness of trade dress in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 196 USPQ at 291.[11] *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1684-85 (Fed. Cir. 2010).

We also believe it is appropriate when determining if trade dress is generic to apply a similar two-step inquiry that we apply to word marks, where we first determine the genus of goods or services at issue, and second, determine whether the consuming public primarily regards the matter sought to be registered as a category or type of trade dress for the genus of goods or services. *See Sunrise Jewelry*, 50 USPQ2d at 1536; *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.,* 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). In *Sunrise Jewelry*, the Federal Circuit denominated a genus. *See Sunrise Jewelry*, 50 USPQ2d at 1536 (assessing the genericness of the design at issue as to "the genus of clocks, watches, and jewelry made of precious metal"). And, the Court assessed whether consumers would

---

[11] The first *Seabrook* test is: whether the mark was a "common" basic shape or design. The remaining tests are discussed infra. *Seabrook Foods v. Bar-Well Foods*, 196 USPQ at 291.

associate the trade dress primarily with the genus (i.e., the identified goods) or with the producer. *Id*. (asking whether consumers would associate the "metallic nautical rope design" at issue with the product category "rather than with Fred's specific line of products").

With regard to the first inquiry, there is no dispute regarding the relevant category of goods, which is defined by the identification, socks. *Cf. H. Marvin Ginn*, 28 USPQ at 530. As for the second inquiry, the relevant consumers are those who purchase or wear socks. We consider the evidence of record regarding the primary significance of the applied-for trade dress to those consumers.

"Cases have recognized that competitor use is evidence of genericness," *Stuart Spector Designs,* 94 USPQ2d at 1555 (citing *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 35 USPQ2d 1554, 1558 (Fed. Cir. 1995)), and the Examining Attorney points to the evidence of record with 32 examples of socks secured with rectangular packaging including 11 examples of side-by-side placement and concludes that "[t]he common and wide-spread use of rectangular packaging for one or more pairs of socks, often side-by-side, shows that the applied-for mark features ordinary packaging and product arrangement that is not inherently distinctive and is wholly incapable of acquiring distinctiveness." 16 TTABVUE 8. "The evidence of record shows common third-party use of rectangular packaging for sock displays. While the size of the rectangle may vary, and the precise placement of the socks may vary, the widespread use of the overall configuration for displaying a pair of socks renders the applied-for

mark generic. As such, consumers would not view the packaging alone as an indicator of the source of the goods." *Id.*

Applicant "does not disagree that multiple pairs of socks are commonly packaged side by side," but argues that "packaging a single pair of socks side by side is very unusual and is not expected by the consumers and therefore makes an extremely distinct commercial impression on the consumer. Display space at retailers is at an ultimate premium and for that reason single pairs of socks are packaged front to back, in direct contrast to Applicant's elongated rectangular design." 10 TTABVUE 11-12.

Applicant's argument that the display of a single pair of socks side-by-side is unique and unusual because it takes up more display space and forms a different overall shape is not supported by any record evidence. Moreover, as conceded by Applicant, and as the record shows, it is common for multiple pairs of socks to be displayed side-by-side taking up retail space. The only possible "unusual" aspect is that Applicant displays only one pair of socks rather than multiple pairs.

Looking at, for example, the Mickey/Minnie Mouse and Betty Boop images shown above, the socks are hanging from an elongated rectangle and are presented side-by-side where the toe is flattened and faces forward and the heel is flattened and faces backward. They appear to be more than one pair of socks but the overall commercial impression is the same as for a display of a single pair of socks. *Cf. Stuart Spector Designs*, 94 USPQ2d at 1567-68 ("It is simply not reasonable to conclude that the average consumer of guitars, which would include non-musical parents buying a guitar for their child, could distinguish one guitar from another based solely on a

millimeter of difference in the body shape."). While the socks in these examples are shorter than the long socks displayed in Applicant's drawing, that fact is not a noteworthy point of difference. *Id.* Moreover, the applied-for mark does not claim a specific size of sock as the socks are depicted in dotted lines. From this record, it is clear that rectangular packaging enabling the hanging of socks from front-to-back and side-by-side is so common in the industry that such packaging is not capable of indicating source, and rectangular packaging enabling the hanging of a **single** pair of socks side-by-side is at most a minor variation of the common form of packaging. *Nora Beverages*, 60 USPQ2d at 1041.

Moreover, where the possibilities for the trade dress are limited, this provides an additional basis for finding that it is unlikely that consumers will view the trade dress as indicating source. *Mana Prods.*, 36 USPQ2d at 1180. The record reveals that the placement of socks side-by-side and front-to-back may be useful to sellers and appealing to consumers. For example, a seller may want the consumer to see a feature of the product, namely, that the socks when placed together form a single image  or may want to display the two styles available in the package  . Thus, the possibilities for variations on trade dress for the display of socks are limited and Applicant's claimed trade dress would limit further competitor's ability to display their single image socks side by side.

Viewing the record as a whole, the evidence shows that consumers of socks would primarily regard the applied-for product packaging as a common type of packaging

for socks, rather than as a source indicator for Applicant's socks in particular. In view of the above, we find Applicant's packaging trade dress to be generic.

## IV. Whether the Packaging is Inherently Distinctive

For completeness, we consider the alternative ground for refusal that even if the trade dress is not generic, it is still not inherently distinctive. While product design trade dress is never inherently distinctive, packaging trade dress may be. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065, 1068, 1069-70 (2000). Applicant's applied-for trade dress has been categorized and described as packaging.

"[A] mark is inherently distinctive if '[its] intrinsic nature serves to identify a particular source.'" *Wal-Mart Stores,* 54 USPQ2d at 1068 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 23 USPQ2d 1081, 1083 (1992)). It "should be displayed with such prominence as will enable easy recognition" and "the average consumer will regard it as an unmistakable, certain, and primary means of identification pointing distinctly to the commercial origins of such product." *In re Swift & Co.,* 223 F.2d 950, 106 USPQ 286, 289 (CCPA 1955). "[U]ltimately 'the focus of the [inherent distinctiveness] inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive.'" *Chippendales*, 96 USPQ2d at 1685 (quoting *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1331 (Fed. Cir. 1994)). As noted above, to determine whether or not packaging trade dress is inherently distinctive, we apply the four-part test set forth in *Seabrook*:

1) whether it is a "common" basic shape or design;

2) whether it is unique or unusual in the particular field;

3) whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods; or

4) Whether it is capable of creating a commercial impression distinct from the accompanying words.

*Seabrook*, 196 USPQ at 291. If the Examining Attorney shows that the involved packaging is a common basic shape or design, is not unique or unusual in a particular field, or is a mere refinement of common ornamentation it is not inherently distinctive. *Chippendales*, 96 USPQ2d at 1684. Our findings above concerning the evidence establish that under the first *Seabrook* test the applied for trade dress is a common basic shape or design for sock packaging and, thus, the trade dress is not inherently distinctive. For completeness, however, we address Applicant's arguments concerning the four *Seabrook* tests.

Applicant argues that under the first and second tests in *Seabrook* its:

> [m]ark is not a common basic shape or design and is unique and unusual in the field in which it is used. The common packaging for a single pair of socks is that of a front to back stacking of the pair of socks. Applicant's Mark is unique and unusual within the sock industry in that the Mark incorporates an elongated packaging which positions the socks *side by side*. The unique and unusual nature of Applicant's Mark creates a commercial impression on consumers that they come from a single source, particularly, Applicant. Applicant's Mark is a new and unique product packaging that was not used in the industry before Applicant and is currently used by competitors attempting to trade on Applicant's goodwill.

14 TTABVUE 20 (emphasis in original).

As to the third and fourth tests, Applicant contends that its trade dress is not a mere refinement because Applicant "uses an unusual width of display space for a single pair of socks. A **single** pair of socks side by side is very unusual and is not expected by the consumers and therefore makes an extremely distinct commercial impression on the consumer." 14 TTABVUE 21 (emphasis in original). As noted above, Applicant's applied-for trade dress consists of an elongated rectangle from which hangs a single pair of socks with the toes flattened facing forward hanging side-by-side.

As discussed above, the record includes multiple examples of rectangular packaging of varying lengths with toes flattened facing forward and heels flattened facing backward. The evidence establishes that an elongated rectangle from which to hang a pair or pairs of socks is a common shape in the socks industry, and Applicant's particular packaging is not unique or unusual in the field of socks. Although there appears to be only one example of such packaging that display only a single pair of socks, we find that such a display is, at most, a mere refinement of the attributes of the existing packaging in the record. *See In re Chevron Intellectual Prop. Grp. LLC*, 96 USPQ2d 2026, 2029 (TTAB 2010) (pole spanner sign for service stations not inherently distinctive because it is common for service stations to use pole spanners in various shapes and because the spanners are in common geometric shapes are less likely to stand out as distinctive elements of the overall pump ornamentation). Thus, as the Examining Attorney reasons, "[a]lthough the size and orientation of the rectangle may vary, and the precise placement of the socks may vary, [because of] the

widespread use of the overall configuration for holding a pair of socks" the applied-for mark is not inherently distinctive. 16 TTABVUE 11. The side-by-side display of a single pair of socks rather than multiple pairs would not be a striking or source-identifying differentiating feature of sock packaging to a potential consumer. *See Mana Prods.*, 36 USPQ2d at 1180 ("In the compact industry, nothing about a rectangular or square shape or black color is 'striking, unusual, or otherwise likely to differentiate the products of a particular producer.'") (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 13 cmt. d (1995)). These multiple examples provide a "reasonable predicate" for the Examining Attorney's position that the subject matter is not inherently distinctive. *Pacer Tech.*, 67 USPQ2d at 1631.

Applicant asserts that the side-by-side packaging was not used in the industry before Applicant used it. 4 TTABVUE 9. In the context of ornamental trade dress, the Board has held that even if an applicant is the only user, "this fact alone does not imbue the design with source-indicating significance, where the applicant's design merely repeats an ordinary shape in an unremarkable pattern and places it on the goods in an unremarkable way." *Fantasia Distrib.*, 120 USPQ2d at 1141. In the context of product configuration, the Board has held that "while applicant's applied for design may be unique in the sense that it is a 'one and only,' the record demonstrates that said design is not unique in the sense it has an 'original, distinctive, and peculiar appearance.' In other words, the record demonstrates that applicant's applied for design is not inherently distinctive or unique in the sense that the term 'distinct' is defined as 'clearly perceived or marked off' or 'unmistakable,' or

in the sense that the term 'unique' is defined as 'highly unusual, extraordinary.'" *In re E S Robbins Corp.*, 30 USPQ2d 1540, 1542 (TTAB 1992) (internal citations omitted). *See also In re J. Kinderman & Sons Inc.*, 46 USPQ2d 1253, 1255 (TTAB 1998) ("[W]hile the designs applicant seeks to register may be unique in the sense that we have no evidence that anyone else is using designs which are identical to them, they are nonetheless not inherently distinctive. … [A]pplicant's designs, which consist of stars and the colors red, green and gold, and indeed resemble wrapped Christmas presents, are a mere refinement of a form of ornamentation for Christmas merchandise. As such, purchasers and prospective customers for applicant's goods would be unlikely to regard these designs as identifying and distinguishing applicant's Christmas tree lights and indicating their source.").

Similarly, here, even if we were to assume, contrary to the evidence in the record, that no competitor uses packaging identical to Applicant's, this does not render Applicant's packaging inherently distinctive where it consists of a commonly used rectangular holder with socks hanging down. The evidence shows that packaging displaying pairs of socks side-by-side is a common basic shape or design and is not unique or unusual in this field, and the attribute of displaying only a single pair of socks would not be "perceived or marked off" as distinct from the other similar packaging. *E S Robbins*, 30 USPQ2d at 1542. This is not a circumstance where the packaging's "intrinsic nature serves to identify a particular source of the product," *Two Pesos v. Taco Cabana*, 23 USPQ2d at 1083.

Finally, as shown by the specimen of use, the rectangular holder includes the wording ODD SOX and there is no evidence to show that the packaging creates a commercial impression separate and apart from the wording.[12] *Seabrook*, 196 USPQ at 291. The packaging is thus nondistinctive under each of the *Seabrook* tests.

**Decision**: The refusals to register Applicant's mark are affirmed on the grounds that it is generic trade dress packaging and, in the alternative, that it is not inherently distinctive.

---

[12] June 2, 2014 Application.