This Opinion is a
Precedent of the TTAB

Mailed: May 25, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Palacio Del Rio, Inc.*

————

Serial Nos. 88412764 and 88437801

————

Courtenay B. Allen of Pizarro Allen PC,
    for Palacio Del Rio, Inc.

Erin Falk, Trademark Examining Attorney, Law Office 101,
    Zachary R. Sparer, Managing Attorney.

————

Before Shaw, Goodman and Hudis,
    Administrative Trademark Judges.

Opinion by Hudis, Administrative Trademark Judge:

Palacio Del Rio, Inc. ("Applicant") seeks registration on the Principal Register of the proposed building design marks depicted below, both for "[h]otel services; provision of conference, exhibition, and meeting facilities" in International Class 43:

 

Ser. No. 88412764[1]

Hotel Hilton Palacio del Rio
River Side View

Ser. No. 88437801[2]

Hotel Hilton Palacio del Rio
Street Side View

The Trademark Examining Attorney refused registration under Trademark Act

Sections 1, 2, 3 and 45, 15 U.S.C. §§ 1051, 1052, 1053 and 1127, on the ground that

Applicant's proposed marks, as applied to the services identified in the Applications,

consist of nondistinctive trade dress that would not be perceived as service marks.

Applicant argued against this refusal and, in the alternative, argued that the

proposed marks had acquired distinctiveness under Trademark Act Section 2(f), 15

---

[1] Application Serial No. 88412764 (the "'764 Application") was filed on May 2, 2019, under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), based on Applicant's claim of first use of the proposed mark anywhere and first use in commerce since at least as early as April 30, 1968. Description discussed infra, in Section I. The designation "River Side View" originates from the Pfeiffer, Begley, Tunstall and Holliday Declarations submitted by Applicant, which we discuss in detail below.

[2] Application Serial No. 88437801 (the "'801 Application") was filed on May 20, 2019, under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), based on Applicant's claim of first use of the proposed mark anywhere and first use in commerce since at least as early as April 30, 1968. Description discussed infra, in Section I. The designation "Street Side View" also originates from the Pfeiffer, Begley, Tunstall and Holliday Declarations submitted by Applicant.

U.S.C. § 1052(f). The Examining Attorney, however, determined that Applicant's evidence of acquired distinctiveness was insufficient to support registration of either proposed mark.

When the refusals were made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the requests for reconsideration, the appeals resumed. Once the Board resumed the appeals, the Examining Attorney moved for consolidation, which the Board granted. We decide these consolidated appeals in a single opinion,[3] and affirm the refusals to register.

The prosecution records for, and arguments raised pertaining to, the Applications on appeal, although not identical, are highly similar. Unless otherwise stated, our citations to the evidentiary record, Applicant's Briefs and the Examining Attorney's Brief pertain to the '764 Application.[4]

## I.    Defining Applicant's Proposed Marks

Before addressing the merits of the nondistinctive trade dress refusals, "we first must define what Applicant intends to claim as … [its mark or marks]," *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1487 and n.45 (TTAB 2017) (quoting *In*

---

[3] *In re Pohl-Boskamp GmbH & Co.*, 106 USPQ2d 1042, 1043 (TTAB 2013) (two appeals involving common issues of law and fact decided in a single opinion); *In re Binion*, 93 USPQ2d 1531, 1533 (TTAB 2009) (because appeals involved common questions of law and fact and records were practically identical, Board decided both in a single opinion).

[4] Page references herein to the application record refer to the online database of the United States Patent and Trademark Office's ("USPTO") Trademark Status & Document Retrieval ("TSDR") system. All citations to documents contained in the TSDR database are to the downloadable .pdf versions of the documents in the TSDR Case Viewer. References to the briefs on appeal refer to the Board's TTABVUE docket system. Before the TTABVUE designation is the docket entry number; and after this designation are the page references, if applicable.

*re Heatcon, Inc.*, 116 USPQ2d 1366, 1371 (TTAB 2015)), because on appeal the contours of Applicant's proposed marks as defined by Applicant and the Examining Attorney differ. *In re OEP Enters., Inc.*, 2019 USPQ2d 309323, at \*2 and n.18 (TTAB 2019) (defining the elements of applicant's claimed umbrella design mark before considering the merits of the examining attorney's refusal to register the mark).

| **Applicant's Proposed Mark of the '764 Application** | **Applicant's Proposed Mark of the '801 Application** |
|---|---|
|  |  |
| **… as defined in the Application:** | **… as defined in the Application:** |
| The mark consists of the three-dimensional configuration of the exterior of a building. The building includes two groups of multi-story, grid-like hotel rooms arranged in alternating protrusions and recesses and separated by a smooth column in the middle. The top of the building includes an outwardly extending crown. The base of the building includes a series of arches that extend beyond the hotel rooms on one end. | The mark consists of the three-dimensional configuration of the exterior of a building. The building includes multi-story, grid-like hotel rooms arranged in alternating protrusions and recesses. The top of the building includes an outwardly extending crown. The base of the building includes a series of arches that extend beyond the hotel rooms on one end. |

**… as defined in Applicant's Briefs for both Applications:**

[A] pattern of alternately protruding and receding rectangular shapes created by the assembly of modular guest room units, smooth end portions, a smooth middle portion on the river side, tall closely spaced columns in the lower portion that extend beyond the modular guest room portion on one end, and outwardly angled upper crown portions. [6 TTABVUE 10].

**… as defined in the Examining Attorney's Briefs for both Applications:**

[T]he configuration of a modular building in three-dimension form … consist[ing] of the configuration of the front and rear view of a building … comprised of common architectural features (e.g., arches and support beams, a grid of rooms, column in the center for elevators and lobby area, area on far side of building for elevator bay, doors to the building, exhaust at the top of the building, gazebo, structural columns, etc.) …. [10 TTABVUE 6, 8].

"Applicant's application 'drawing[s] depict[] the mark[s] to be registered.'" *Kohler*, 125 USPQ2d at 1488 (quoting *Heatcon*, 116 USPQ2d at 1379) (citing Trademark Rule 2.52, 37 C.F.R. § 2.52)); *see also In re Thrifty, Inc.*, 274 F.3d 1349, 61 USPQ2d 1121, 1123 (Fed. Cir. 2001); *In re Change Wind Corp.*, 123 USPQ2d 1453, 1459 n.6 (TTAB 2017) ("[T]he drawing of the mark, not the words an applicant uses to describe it, controls what the mark is.").[5]

Although Applicant filed two separate applications for marks that include a number of different elements, Applicant addresses the issues throughout prosecution and on appeal as though it has applied to register one mark for an entire building.[6] The Examining Attorney, in her Brief, confirms her understanding that Applicant's

---

[5] Further, "configuration marks require special form drawings and must depict matter not claimed as part of the mark in broken lines. Broken lines must also be used to indicate placement of the mark." *Kohler*, 125 USPQ2d at 1488 (quoting *Heatcon*, 116 USPQ2d at 1379). Numerous times during prosecution, the Examining Attorney requested that Applicant provide amended drawings of the proposed marks with areas the Examining Attorney considered to be nondistinctive shown in dotted lines, pursuant to Trademark Rule 2.52(b)(4), 37 C.F.R. § 2.52(b)(4). Office Action of September 7, 2020, at TSDR 3-4; Office Action of March 26, 2021, at TSDR 1-2; Office Action of August 31, 2021, at TSDR 1-2. On each occasion, Applicant declined to do so, stating that its proposed marks comprise the overall appearance of each entire building design, and that no specific components should be excluded by dotted line depictions. Office Action Response of March 8, 2021 at TSDR 9; Office Action Response of September 24, 2021, at TSDR 15. Therefore, we consider the building configuration in each application in its entirety without any matter excluded.

[6] Applicant's Brief, 6 TTABVUE 8, 13; Applicant's Reply Brief 11 TTABVUE 5. To be clear, the two configurations comprising the Applications on appeal make up opposites sides of a single building.

claim of service mark rights pertains to the overall rendition of the two sides and top of the building designs for which it seeks registration.[7]

Generally, an applicant may apply to register any element of a composite mark if that element presents, or will present, a separate and distinct commercial impression apart from any other matter with which the mark is or will be used on the specimen, i.e., the element performs a trademark function in and of itself. *See, e.g., In re Univ. of Miami*, 123 USPQ2d 1075, 1079 (TTAB 2017). Thus, if Applicant intended to claim the "River" and "Street" sides of its hotel building as separate marks (that indeed are different), which it effectively did by filing two applications, this should be reflected in the descriptions (e.g., … consists of the front, or … consists of the back, of a building).

Because the "mark" of each Application clearly is three-dimensional, under Trademark Rule 2.52(b)(2), Applicant is required to submit a drawing depicting a single rendition of the mark. *See In re Schaefer Marine, Inc.*, 223 USPQ 170, 171 n.1 (TTAB 1984) ("Although … [the applicant's] drawing is only a single, two-dimensional view of the goods …, it is clear from the prosecution of this case and its appeal that what … [applicant] seeks to register as a trademark is a collocation of certain design features of the … configuration rather than that the mark is a two dimensional representation of a portion of the product…."). If, however, Applicant intended to seek registration for one mark comprising the entire building (where the two sides are different), early during prosecution it could have filed a petition under Trademark

---

[7] Examining Attorney's Brief, 10 TTABVUE 6-8, 13, 16.

Rule 2.146, 37 C.F.R. § 2.146, requesting that the rule for a "single" rendition be waived, allowing for both depictions in one application and, as such, comprising one proposed mark for the building.

Under the approach taken by Applicant, we thus note differences between: (1) the drawings Applicant submitted with its applications as compared to the descriptions of each "mark," and (2) the marks sought for registration (each of different sides of the same hotel building) versus the evidence and arguments Applicant submitted during prosecution and raised on appeal (purporting to support registration for the design of the whole hotel building). Although consolidated, we consider each application to be for a separate individual mark and we consider the evidence and argument as it pertains to each separate mark. *In re Hudson News Co.*, 39 USPQ2d 1915, 1916 n.5 (TTAB 1996) (Board issued a single opinion in interest of judicial economy, but each appeal stands on its own merits), *aff'd without opinion*, 114 F.3d 1207 (Fed. Cir. 1997). In sum, we find that Applicant seeks to register two different marks for different sides of the same building, and we consider the evidence and arguments accordingly.

## II. Applicable Law and Analysis

### A. Statutory Definition of a Service Mark

When a proposed mark fails to meet the statutory definition of a trademark or service mark, it is ineligible for registration. Sections 1, 2, 3 and 45 of the Trademark Act provide the statutory basis for refusal to register subject matter that does not function as a service mark. Specifically:

- Sections 1 and 2 provide for the application and registration on the Principal Register of "trademark[s] by which the goods of the applicant may be distinguished from the goods of others";

- Section 3 applies to service marks and provides that service marks shall be registrable in the same manner as trademarks; and

- Section 45 defines a "trademark" and "service mark" in pertinent part, as "any word, name, symbol, or device, or any combination thereof ... used by a person, or ... which a person has a bona fide intention to use in commerce … to identify and distinguish his or her goods [or services], including a unique product [or service], from those manufactured or sold [or provided] by others, and to indicate the source of the goods [or services], even if that source is unknown."

The USPTO thus "is statutorily constrained to register matter on the Principal Register if and only if it functions as a mark." *In re Brunetti*, 2022 USPQ2d 764, at *9 (TTAB 2022). *See also In re Vox Populi Registry, Ltd.*, 25 F.4th 1348, 2022 USPQ2d 115, at *2 (Fed. Cir. 2022) ("Under the … [Trademark] Act, 'no service mark by which the services of the applicant may be distinguished from the services of others shall be refused registration on the principal register on account of its nature' subject to certain exceptions. 15 U.S.C. §§ 1052-53. One of these exceptions is that a service or trademark must function to 'identify and distinguish the services of one person ... from the services of others and to indicate the source of the services.' 15 U.S.C. § 1127."); *In re The Ride, LLC*, 2020 USPQ2d 39644, at *5-6 (TTAB 2020). "Matter that does not operate to indicate the source or origin of the identified goods or services and distinguish them from those of others does not meet the statutory definition of a trademark and may not be registered ...." *In re Greenwood*, 2020 USPQ2d 11439, at *2 (TTAB 2020) (quoting *In re AC Webconnecting Holding B.V.*, 2020 USPQ2d 11048, at *2-3 (TTAB 2020)).

### B. Registrability of Building Designs as Service Marks – Are the Two Sides of Applicant's Building Design Each Inherently Distinctive?

Applicant heavily relies on the Supreme Court's opinion in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 23 USPQ2d 1081 (1992). In *Two Pesos*, the Supreme Court held that "[i]f … [trade dress for which protection is claimed] is [inherently distinctive], it is capable of identifying products or services as coming from a specific source and secondary meaning is not required." *Id.* at 1085. Used in connection with services, trade dress consisting of a building may consist of visual elements comprising the total image and overall appearance of a business, including features such as size, shape, color or color combinations, texture and graphics, *Id.* at 1082 n.1, which serves the Trademark Act's purpose to secure to the owner of the mark the goodwill of its business and to protect the ability of consumers to distinguish among competitors' services. *Id.* at 1086.

The restaurant trade dress at issue in *Two Pesos* was described by the Supreme Court as follows:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals.
>
> The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Id.* at 1082 (citation omitted). Because the restaurant service mark trade dress defined in *Two Pesos* involved decorations, paintings, murals and a color scheme, it is not comparable on all-fours to the trade dress involved in these appeals; which

concern the design elements of a hotel building structure without separate adornments. At its core, *Two Pesos* establishes the adornments to a building structure may be protectable as a service mark.

The Supreme Court again considered the protectability of trade dress, and its relationship to the question of distinctiveness, in *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 54 USPQ2d 1065, 1068-69 (2000). In *Wal-Mart*, for purposes of analysis, the court distinguished so-called "product packaging" from "product design" (the configuration of the product itself, which ordinarily renders it more useful or appealing). The Court noted that some types of product packaging may qualify as inherently distinctive because consumers are "predisposed to regard [some forms of packaging] as indication of the producer." 54 USPQ2d at 1068.[8]

The trade dress involved in *Wal-Mart* consisted of "a line of spring/summer one-piece seersucker outfits decorated with appliqués of hearts, flowers, fruits, and the like." 54 USPQ2d at 1066. Even though the trade dress discussed in *Wal-Mart* involved clothing, not the trade dress of a three-dimensional building, its principles are instructive. In fact, discussing the facts and holding of *Two Pesos*, the Court in *Wal-Mart* stated:

> *Two Pesos* unquestionably establishes the legal principle that trade dress can be inherently distinctive [citation omitted], but it does not establish that **product-design** trade dress can be. *Two Pesos* is inapposite to our holding here because the trade dress at issue, the décor of a restaurant, seems to us not to constitute product **design**. It was either product

---

[8] While product packaging is capable of protection without a showing of secondary meaning, product design (or configuration) may be protected under the Trademark Act only upon a showing of secondary meaning, because "consumer predisposition to equate [a product] feature with the source does not exist." *Id.* at 1068-70.

packaging – which, as we have discussed, normally **is** taken by the consumer to indicate origin – or else some **tertium quid** [third thing] that is akin to product packaging and has no bearing on the present case.

Respondent [Samara Brothers] replies that this manner of distinguishing *Two Pesos* will force courts to draw difficult lines between product-design and product-packaging trade dress. There will indeed be some hard cases at the margin …. We believe, however, that the frequency and the difficulty of having to distinguish between product design and product packaging will be much less than the frequency and the difficulty of having to decide when a product design is inherently distinctive. To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning. The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning.

54 USPQ2d at 1069-70. Following the teachings of *Two Pesos* and *Wal-Mart*, we consider whether Applicant's proposed marks are inherently distinctive for Applicant's services under the paradigm established for "product packaging."[9] That is, the hotel building designs are akin to the packaging of what is being rendered and sold inside, namely, hotel services; thus constituting trade dress for the services. *See e.g.*, *In re Frankish Enters. Ltd.*, 113 USPQ2d 1964, 1973 (TTAB 2015) (finding three-dimensional monster truck design, used in connection with monster truck exhibition services, to be analogous to product packaging for the services, constituting trade dress for the services that was unique in the monster truck field); TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) §§ 1202.02(c) and 1301.2(c) (July 2022). Thus, all references to "trade dress" in the discussion that follows pertain to the

---

[9] To be clear, the Examining Attorney's refusal here at issue is not based on any contention that Applicant's proposed marks are product design and thus disqualified from ever being considered inherently distinctive.

paradigm established for "packaging," even though what we consider here are "services" and not "products."

We pause here to provide the case law definitions of certain terms of art frequently used in considering the protection of trademarks, service marks and trade dress (collectively, "marks"). A mark is "inherently distinctive" if its intrinsic nature serves to identify a particular source. *Wal-Mart*, 54 USPQ2d at 1068 (citing *Two Pesos*, 23 USPQ2d at 1083). A mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product or service rather than the product or service itself. *Id.* (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1 n.11 (1982)).

In determining whether service mark trade dress is inherently distinctive, the ultimate focus is on whether a consumer will immediately rely on it as an indicator of source of origin, even if that source (provider) is unknown, and to differentiate the services from those of competing providers. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1685 (Fed. Cir. 2010).

We generally consider the following factors to determine whether Applicant's proposed marks are inherently distinctive in connection with the identified services:

(1) Whether the proposed marks constitute a "common" basic shape or design;

(2) Whether the proposed marks are unique or unusual in the field in which they are used;

(3) Whether the proposed marks are a mere refinement of commonly adopted and well-known forms of ornamentation for the particular class of services viewed by the public as a dress or ornamentation for the services; and

(4) Whether the proposed marks are capable of creating a commercial impression distinct from the accompanying words.

*In re Chevron Intell. Prop. Grp. LLC*, 96 USPQ2d 2026, 2027 (TTAB 2010) (citing *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977)) (the "*Seabrook* Factors"). Any one of the *Seabrook* Factors, by itself, may be determinative as to whether the mark is inherently distinctive. *In re Chippendales*, 96 USPQ2d at 1687; *In re Chevron*, 96 USPQ2d at 2028; *see also* TMEP § 1301.02(c) ("Three-Dimensional Service Marks") and cases cited therein.

### 1. Analysis of the First Three *Seabrook* Factors

Applicant's arguments on the first three *Seabrook* Factors rely on the same evidence, so here we consider the Factors together. To demonstrate how Applicant's proposed marks appear as used in commerce, we compare below the drawings and building images that Applicant made of record during prosecution:

| **Applicant's Proposed Mark of the '764 Application** | **Applicant's Proposed Mark of the '801 Application** |
|---|---|
|  |  |

**Office Action Response of September 24, 2021, at TSDR 121**

**Office Action Response of September 24, 2021, at TSDR 103**





To support the argument that Applicant's proposed marks each constitute a "common" basic shape or design,[10] the Examining Attorney made of record the following evidence to show that many hotels share common design elements of a modular building (e.g., grid-like hotel rooms, smooth column, outwardly extending crown, and arches) that are similar to Applicant's proposed marks in overall style or in significant part:

| Source | Image(s) |
| --- | --- |
| WoodSpring Suites, Texas, cadnav.com [Office Action of September 7, 2020, at TSDR 65] |   |
| Fountainbleau Hotel, Florida, fountainbleu.com [Office Action of October 27, 2021, at TSDR 12] |  |

---

[10] Examining Attorney's Brief, 10 TTABVUE 7-8.

| Source | Image(s) |
|---|---|
| Pasea Hotel and Spa, California, californiabeaches.com [Office Action of October 27, 2021, at TSDR 20] |  |
| Renaissance Club Sport, California, Marriott.com/hotels [Office Action of October 27, 2021, at TSDR 26] |  |
| Disney Paradise Pier Hotel, California, wdwinfo.com [Office Action of October 27, 2021, at TSDR 32] |  |
| Courtyard Marriott, California, Marriott.com/hotels [Office Action of October 27, 2021, at TSDR 60-61] |  |

| **Source** | **Image(s)** |
| --- | --- |
| Marriott Warner Center, California, Marriott.com/hotels [Office Action of October 27, 2021, at TSDR 85] |  |
| Crowne Plaza Los Angeles Harbor, California ihg.com/crowneplaza [Office Action of October 27, 2021, at TSDR 96] |  |
| Omni La Mansion del Rio, Texas, hotelsone.com /san-antonio-hotels-us /omni-la-mansion-del-rio.html [Office Action of October 27, 2021, at TSDR 101] |  |

| Source | Image(s) |
|---|---|
| The Westin Riverwalk, Texas, marriott.com/hotels/travel/satvw-the-westin-riverwalk-san-antonio [Office Action of October 27, 2021, at TSDR 111-12] |  |
| La Quinta by Wyndham, Texas, wyndhamhotels.com/laquinta/san-antonio-texas/ia-quinta-san-antonio-riverwalk [Office Action of October 27, 2021, at TSDR 122] |  |

Notwithstanding Applicant's admissions that "certain elements of … [Applicant's] overall design[s] may be found in other building designs" and that "the appearance [of Applicant's building design(s)] results from a modular process,"[11] Applicant argues that the building's two designs comprising its proposed marks are "inherently distinctive," "a unique design unlike any other in the world," "iconic," and "uniquely indicative of Applicant's services."[12] Applicant supports these arguments with articles from Wikipedia, the *San Antonio Express-News* and the *Modular Building Institute*.[13] These articles say almost nothing about the inherent distinctiveness of

---

[11] Applicant's Brief, 6 TTABVUE 7, 9.

[12] Applicant's Brief, 6 TTABVUE 6.

[13] Office Action Response of January 16, 2020, at TSDR 11-21.

Applicant's building design(s), but rather mainly discuss the modular process by which the hotel building was quickly and efficiently constructed.

Applicant also supports its arguments of inherent distinctiveness with declarations from four customers of the Hilton Palacio Del Rio hotel:[14]

- Alice Pfeiffer, a Meeting and Event Planner for a company named Corporate Travel Planners based in San Antonio, Texas;
- Mandy Begley, a Senior Event Manager at the Texas Association of School Boards, Inc.;
- Wendy Tunstall, the Executive Director for Phi Alpha Theta, the National History Honor Society; and
- Janet Holliday, a lifelong resident of San Antonio.

Apart from stating the basis for each declarant's individual knowledge of the Hilton Palacio Del Rio hotel, all of the declarations provide essentially the same recitation:

> 5. The Hotel is widely considered to be a San Antonio icon due to its unique exterior appearance.
>
> 6. The Hotel includes a number of features that collectively contribute to its distinctive overall exterior appearance, including a pattern of alternately protruding and receding rectangular shapes created by the assembly of its modular guest room units, smooth end portions, a smooth middle portion on the river side of the Hotel, tall closely spaced columns in the lower portion that extend beyond the modular guest room portion on one end, and outwardly angled upper crown portions.
>
> 7. In view of that combination of features, the three-dimensional appearance of the Hotel's exterior is not simply a refinement of commonly adopted and well known hotel design elements but instead reflects a unique and readily recognizable design.
>
> 8. I am aware that the Hotel is considered a milestone of modular architecture and construction techniques and innovative design.

---

[14] Office Action Response of January 16, 2020, at TSDR 22-34. As we discuss below, Applicant also relies in part on these four declarations to support its alternative argument that Applicant's proposed marks have acquired distinctiveness.

9. I have traveled extensively across the United States and have not encountered a hotel building exterior that is the same as or substantially similar to the Hotel.

10. The Hotel is instantly recognized by customers due to its unique exterior appearance, even apart from the words Palacio del Rio.

11. Based on my personal experience with the Hotel, I believe the building's external configuration is very distinctive in the context of hotels.

12. When consumers encounter an image of the Hotel's building design as embodied in the above referenced Marks, they instantly associate that design with the Services provided by the above referenced Applicant and rely on that design to differentiate the Applicant and its Services from other competing service providers.

The Examining Attorney criticizes the four customer affidavits as not being probative because they are few (only four submitted), substantively identical, and include legal conclusions of the marks' distinctiveness from persons who do not have legal expertise. This evidence, says the Examining Attorney, is insufficient to show Applicant's proposed marks as source identifiers or that they are recognized as identifying the source of Applicant's services.[15]

We agree that the customer declarations on which Applicant's distinctiveness argument is based are too few in number and are in many ways identical or "cookie cutter," diminishing their persuasiveness in these appeals. *See Kohler*, 125 USPQ2d at 1507 (Declarations "all essentially identical in form and … clearly not composed individually … are less persuasive than statements expressed in the declarants' own words.") (quoting *In re Pohl-Baskamp GmbH & Co.*, 106 USPQ2d 1042, 1051 (TTAB 2013)).

---

[15] Examining Attorney's Brief, 10 TTABVUE 15.

The customer declarations also have minimal probative value to the extent they purport to espouse legal conclusions on the ultimate issue of distinctiveness. Indeed, "[u]nder no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of making his own ultimate conclusion on the entire record." *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 153 (CCPA 1978).

These declarations additionally are of minimal persuasiveness to the extent they allege recognition of the design of the Hilton Palacio Del Rio hotel by other customers, where there is no basis for the declarant's knowledge of hotel customers generally or whether such customers "instantly recognize" Applicant's hotel or "instantly associate" the images of it with Applicant. While "in an ex parte proceeding the Board tolerates some relaxation of the technical requirements for evidence and focuses instead on the spirit and essence of the rules of evidence[,]" *In re Sela Prods., LLC*, 107 USPQ2d 1580, 1584 (TTAB 2013), "it is simply common sense," *id.*, to require statements made in factual declarations to be based on personal knowledge. *See* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

In sum, Applicant's articles and customer declaration evidence do not overcome the Examining Attorney's evidence that Applicant's proposed marks constitute the "common" basic design elements of hotel buildings façades (e.g., grid-like hotel rooms, smooth column, outwardly extending crown, and arches); they are not unique or

unusual in the hotel field, and they are mere refinements of commonly-adopted and well-known forms of ornamentation for hotel buildings that would be viewed by the public "as a dress or ornamentation" for Applicant's hotel services. *Seabrook Foods*, 196 USPQ at 291. Although Applicant's article and declaration evidence discusses some of the details (particularly the modularity of the designs), this paucity of evidence does not sufficiently counter the Examining Attorney's evidence.

Considering the first three *Seabrook* Factors, we find Applicant's marks are not inherently distinctive. That is, from the evidence of record, we conclude that the average hotel customer could not distinguish Applicant's hotel services from those of third parties based on design elements that are common to hotel building designs in general. *Cf. Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1567-68 ) (TTAB 2009) ("[T]here is sufficient support [in the record] to establish rampant third-party use [of similar guitar designs] over the course of over three decades … [to] confirm the lack of distinctiveness. It is simply not reasonable to conclude that the average consumer of guitars … could distinguish one guitar from another based solely on a millimeter of difference in the body shape.").

## 2.    Analysis of the Fourth *Seabrook* Factor

The Examining Attorney argues that "[t]he fourth [Seabrook] factor, whether … [Applicant's proposed] mark[s] … [are] capable of creating a commercial impression distinct from the accompanying words, is inapplicable in this case. [As shown by the drawings in the appealed Applications,] Applicant has not applied for … mark[s] containing any wording so the name or wording on the side of the hotel has no bearing

on the issues before the Board."[16] Applicant argues the declaration evidence it submitted (discussed above) shows otherwise.[17]

We agree with the Examining Attorney that, where an applicant's mark contains no wording, the fourth *Seabrook* Factor "is not applicable." *In re Chippendales*, 96 USPQ2d at 1351-52 (decision involving a cuff-and-collar uniform design with no accompanying wording), *aff'g*, 90 USPQ2d 1535, 1546 n.14 (TTAB 2009) ("Given the manner in which the product packaging in *Seabrook* differs from the involved design, the fourth *Seabrook* factor is not relevant to this case or similar trade dress questions that frequently arise in contexts where there are no literal elements present."); *see also In re Procter & Gamble Co.*, 105 USPQ2d 1119, n.8 (TTAB 2012) (in an appeal involving a mouthwash container design with no accompanying words in the drawing, the Board stated: "Given the manner in which the product packaging design in *Seabrook Foods* differs from the involved configurations, the fourth *Seabrook Foods* factor—whether the packaging is capable of creating a commercial impression distinct from the accompanying words—is not relevant to this packaging case."). Even were we to assess this factor based on the evidence made of record in these appeals, it provides no support for Applicant.

In *Seabrook*, the issue was "whether the design portion of Seabrook's mark functions independently of the word portion of the mark in identifying and distinguishing the goods of Seabrook from those of others." *Seabrook*, 196 USPQ at

---

[16] Examining Attorney's Brief, 10 TTABVUE 11.

[17] Applicant's Brief, 6 TTABVUE 9.

291. Similarly, the issue before us is whether Applicant's claimed matter functions independently as a mark, apart from other textual matter with which it commonly appears. Applicant argues that "the customer declarations of record show that the customers' instant recognition of the unique shape of the hotel building is without regard to the word mark PALACIO DEL RIO that is also used in connection with the hotel."[18] Here, however, the specimens and all of the advertising Applicant made of record during prosecution depict the "River" or "Street" side designs of its hotel accompanied by the wording PALACIO DEL RIO or HILTON PALACIO DEL RIO, including on the building itself (emphasis to images added):

| Source | Image |
| --- | --- |
| Ser. No 88412764 of May 2, 2019, at TSDR 12 |  |

---

[18] Applicant's Brief, 6 TTABVUE 10.

Serial Nos. 88412764 and 88437801

| Source | Image |
|--------|-------|
| Ser. No 88412764 of May 2, 2019, at TSDR 13 |  |
| Ser. No 88437801 of May 20, 2019, at TSDR 7 |  |
| Ser. No 88437801 of May 20, 2019, at TSDR 8 |  |

| Source | Image |
|---|---|
| Hilton Honors, Office Action Response of September 24, 2021, at TSDR 105 [from 88412764 file history] |  |
| Booking.com, Office Action Response of September 24, 2021, at TSDR 106 [from 88412764 file history] |  |
| Expedia, Office Action Response of September 24, 2021, at TSDR 113 [from 88412764 file history] |  |
| Hilton Palacio del Rio postcard, Office Action Response of September 24, 2021, at TSDR 103 [from 88437801 file history] |  |

Discussing the fourth *Seabrook* Factor, the Board in *Chevron* stated:

> [A]lluding to *Seabrook* factor 4, applicant contends that the "six-sided beveled shape" creates a commercial impression separate and apart from any other matter on the pole spanner and that it is so distinctive

that consumers will recognize it as a service mark. However, applicant has not submitted any evidence in support of this latter argument, i.e., that the design sought to be registered creates a distinct commercial impression apart from the words and logo featured on the pole spanner design.

*In re Chevron*, 96 USPQ2d at 2029.

Here, the only evidence Applicant points to as demonstrating that its building designs create a separate commercial impression apart from the words PALACIO DEL RIO or HILTON PALACIO DEL RIO are the four third-party declarations discussed above — to which we afford little probative value for the reasons stated. Moreover, there is nothing in the record indicating that Applicant promotes or emphasizes its building designs separate and apart from the hotel's name, or that customers rely upon the building designs alone to identify and distinguish Applicant's hotel services. To the contrary, every depiction of the building designs made of record in these appeals shows the wording thereon.[19] That is how the proposed marks actually appear to consumers.

Based on the evidence made of record, neither of Applicant's proposed marks creates a commercial impression separate and apart from the hotel's name in connection with which the proposed marks are used. *Seabrook*, 196 USPQ at 291.

---

[19] *See, e.g.*, *In re Lean-To Barbecue, Inc.*, 172 USPQ 151, 153 (TTAB 1971) (Affirming refusal of registration: "Applicant is here seeking to register a representation or a design of the building from which the claimed restaurant services are rendered. However, neither the specimens submitted with the application … nor the advertising and promotional material subsequently filed … show use of the building design alone."); *In re Master Kleens of Am., Inc.*, 171 USPQ 438, 439 (TTAB 1971) (Affirming refusal of registration: "It is acknowledged that the building design is a representation of the building from which applicant renders its services. … In none of the advertising available to us does applicant use simply the representation of the building shown on the drawing. What applicant does use is the building with a sign thereon bearing the word 'MASTER KLEEN' and a silhouette figure.").

### 3. Conclusion on the Seabrook Factors

In sum, when we consider Applicant's proposed marks under the first three *Seabrook* Factors, we find they are not inherently distinctive and would not be perceived as service marks for the identified services. As we said above, the fourth *Seabrook* Factor is not applicable in these appeals, because neither drawing in the two applications contains literal elements. Even were we to consider the fourth *Seabrook* factor and took into account Applicant's arguments and evidence made of record as to the fourth factor, we find they do not support a finding of inherent distinctiveness.

### C. Registrability of Building Designs as Service Marks – Have Applicant's Building Designs Acquired Distinctiveness?

Applicant argues in the alternative that, even if its proposed marks are not inherently distinctive, they have acquired distinctiveness. Applicant claims acquired distinctiveness as to its whole building; that is, the overall appearance.[20]

### 1. Applicant's Burden to Prove its Proposed Marks have Acquired Distinctiveness

An applicant seeking registration of a proposed mark based on acquired distinctiveness under Trademark Act Section 2(f) bears the ultimate burden of establishing acquired distinctiveness. *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1265 (Fed. Cir. 2015). "The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered." *In re Gen. Mills IP Holdings II, LLC,*

---

[20] Applicant's Brief, 6 TTABVUE 13-14.

124 USPQ2d 1016, 1018 (TTAB 2017) (citing *Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 829, 166 USPQ 34, 39 (CCPA 1970).

While there is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, the burden is heavier in these appeals because they involve, whether considered separately or together, common elements of modular building designs (e.g., grid-like hotel rooms, smooth column, outwardly extending crown, and arches). *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988) (evidence required to show acquired distinctiveness is directly proportional to the degree of non-distinctiveness of the mark at issue); *In re Sandberg & Sikorski Diamond Corp.*, 42 USPQ2d 1544, 1548 (TTAB 1996) ("In view of the ordinary nature of these designs and the common use of gems in descending order of size on rings, applicant has a heavy burden to establish that its configuration designs have acquired distinctiveness and would not be regarded merely as an ordinary arrangement of gems.").

Based on our review of the evidence under the *Seabrook* Factors, we reiterate the following: Applicant's proposed marks constitute basic elements common to hotel buildings; the designs do not contain or comprise elements that are unique or unusual in the hotel building field; looking at those elements in their entirety, they are mere refinements of commonly-adopted and well-known forms of ornamentation for hotel buildings; and the proposed marks would be viewed by the public merely "as a dress or ornamentation" for Applicant's hotel services. *Seabrook Foods*, 196 USPQ at 291.

Therefore, Applicant's burden of proving acquired distinctiveness is commensurately high.

### 2. Analysis of Applicant's Evidence of Acquired Distinctiveness

In order to prove acquired distinctiveness, Applicant may submit any appropriate evidence tending to show that its proposed marks distinguish its services. *Yamaha*, 6 USPQ2d at 1010 (citing Trademark Rule 2.41(a), 37 C.F.R. § 2.41(a)). "The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark[s] with a single source." *In re LC Trademarks, Inc.*, 121 USPQ2d 1197, 1208 (TTAB 2016). Applicant filed nearly identical evidence to support its claim of acquired distinctiveness during the prosecution of each involved Application. We look at this evidence to determine whether it supports the claim of acquired distinctiveness for the building design shown in the drawing of each application.

When determining whether the evidence shows trade dress at issue has acquired distinctiveness, we consider the following six factors:

(1) association of the trade dress with a particular source by actual purchasers (typically measured by customer surveys);[21]

(2) the length, degree, and exclusivity of use;

(3) the amount and manner of advertising;

(4) the amount of sales and number of customers;

(5) intentional copying; and

(6) unsolicited media coverage of the services in connection with which the trade dress is used.

---

[21] "However, [the] absence of [a] consumer survey[] need not preclude a finding of acquired distinctiveness." *Yamaha*, 6 USPQ2d at 1010.

*See Converse, Inc. v. ITC*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018) ("the *Converse* Factors").

"[N]o single factor is determinative." *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005). "Rather …, [our] determination examines all of the circumstances involving the use of the [proposed] mark[s]." *Id.* However, "[t]he evidence must relate to the promotion and recognition of the specific configuration embodied in [Applicant's proposed] mark[s] and not to … [Applicant's services] in general." *In re Change Wind*, 123 USPQ2d at 1467 (citing *Inwood Labs.*, 214 USPQ at 4 n.11).

We now examine Applicant's submitted evidence of acquired distinctiveness under the *Converse* Factors. We quickly dispense with the *Converse* Factors for which Applicant provided no evidence. On *Converse* Factor 1, Applicant did not submit any surveys. For the reasons we discussed above, we afford Applicant's four customer declarations minimal probative value to show that actual purchasers associate Applicant's proposed marks with a particular source of the services of interest. On *Converse* Factor 5, Applicant did not provide any evidence of intentional copying by third parties.

On *Converse* Factor 2, Applicant relies on the declaration of Brian Getman, Applicant's Vice President-Sales and Revenue, who claims Applicant's proposed marks:

- have "been in substantially continuous and exclusive use as trade dress in association with Applicant's hotel services and provision of conference, exhibition, and meeting facilities in United States commerce since at least as early as April 30, 1968."

- are the subject of "hundreds of thousands of dollars in advertising and promot[ion] …in the United States [since 1968]."

- are the subject of "advertising and promotion … on … [Applicant's] own website [and] … third-party websites ... [that have] has reached millions of consumers, drawing customers from all over the world and continually increasing the public's recognition [thereof]."

- have "achieved widespread recognition and fame among consumers in the United States as being uniquely associated with Applicant, and those efforts have generated millions of dollars in sales …."

- "have also received numerous unsolicited instances of recognition in various highly regarded and widely circulated publications …"[22]

The Examining Attorney criticizes the declaration of Brian Getman as "self-serving and entitled to little weight."[23] *See, e.g., In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA 1961) ("The affidavit of the president of the applicant-company comes from an interested party and we give it little weight."). We afford appropriate weight to the declaration of Applicant's Vice President on a fact-by-fact basis, considering the degree of specificity of each statement Mr. Getman made, its relative consistency with other evidence, and whether it is supported by appropriate documentation.

For example, in view of the evidence the Examining Attorney made of record regarding the uses made by third parties, Applicant's proposed marks comprise commonly found architectural features, and the combination of those ubiquitous elements are not unique as Mr. Getman claims. *Cf. In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012) (in the functionality context,

---

[22] Declaration of Brian Getman ("Getman Decl."), Office Action Response of September 24, 2021, at TSDR 18-20, ¶¶ 5, 8-12. Mr. Getman submitted essentially the same declaration during the prosecution of both Applications now on appeal.

[23] Examining Attorney's Brief, 10 TTABVUE 15.

"the … inquiry is to weigh the elements of a mark against one another to develop an understanding of whether the mark as a whole is … registrable.").

As to the degree of Applicant's use of its proposed marks, as best as we can discern from the record, the elements comprising the trade dress of the Hilton Palacio del Rio hotel are only in use in one city, San Antonio, Texas. We recognize the duration of Applicant's use, however.

On *Converse* Factor 3, Mr. Getman states that "[s]ince 1968, Applicant has spent hundreds of thousands of dollars in advertising and promoting the … [proposed marks] in the United States."[24] Considering that the Hilton Palacio del Rio has been in operation for nearly 55 years, this is not a large amount of advertising expenditures. Further, the specimens and all of the advertising Applicant made of record during prosecution depict the different perspectives of its hotel as shown in the drawings accompanied by the wording PALACIO DEL RIO or HILTON PALACIO DEL RIO, including on the building itself.[25]

Moreover, "[w]hen advertisements are submitted as evidence of acquired distinctiveness, they must demonstrate the promotion and recognition of the specific configuration embodied in the applied-for mark …." *Kohler*, 125 USPQ2d at 1516

---

[24] Getman Decl., Office Action Response of September 24, 2021, at TSDR 19, ¶ 8.

[25] *See* Ser. No 88412764 of May 2, 2019, at TSDR 12; Ser. No 88412764 of May 2, 2019, at TSDR 13; Ser. No 88437801 of May 20, 2019, at TSDR 7; Ser. No 88437801 of May 20, 2019, at TSDR 8; Hilton Honors, Office Action Response of September 24, 2021, at TSDR 105 [from 88412764 file history]; Booking.com, Office Action Response of September 24, 2021, at TSDR 106 [from 88412764 file history]; Expedia, Office Action Response of September 24, 2021, at TSDR 113 [from 88412764 file history]; Hilton Palacio del Rio postcard, Office Action Response of September 24, 2021, at TSDR 103 [from 88437801 file history]

(quoting *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1838 (TTAB 2013)). "The sort of advertising that can demonstrate that a trade dress has acquired distinctiveness is commonly referred to as 'look for' advertising; that is, advertising that directs the consumer to 'look for' the particular feature(s) claimed as a [service] mark." *Id.* Having examined Applicant's advertising, it nowhere encourages consumers or the trade to view Applicant's proposed marks as source indicators. *In re OEP Enters.*, 2019 USPQ2d 309323, at \*23. Given the ways in which Applicant advertises its services, affording little recognition to the design elements of the hotel building itself as shown in the application drawings and described in the Applications, the proposed marks are unlikely to create a commercial impression distinct from the HILTON PALACIO DEL RIO hotel name.

On *Converse* Factor 4, Mr. Getman states that "Applicant has served approximately 2 million hotel guests over the past 10 years in connection with … [Applicant's proposed marks] at Applicant's Palacio del Rio hotel," "[t]he Hotel serves approximately 200,000 guests per year on average," and "Applicant's advertising and promotional efforts … have generated millions of dollars in sales for Applicant's hotel and meeting facilities services."[26]

However, the sales numbers testified to by Mr. Getman lack context. We have no idea how these sales numbers compare to other hotels or hotel chain owners. *Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1480 (TTAB 2016) (probative

---

[26] Getman Decl., Office Action Response of September 24, 2021, at TSDR 18-19, ¶¶ 4, 7 and 11.

value of sales revenue figures quantified as doses sold is diminished by the fact that the amount is just a raw number without context as to the applicant's market share or whether this amount is significant in the industry); *cf. Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002) ("Raw numbers of … sales [from the rendition of services] … in today's world may be misleading.… Consequently, some context in which to place raw statistics is reasonable … [such as] the substantiality of the sales … for comparable [services rendered by others, or Applicant's relative] … market share …."); *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1690, (Fed. Cir. 2018) (as an alternative, the proponent may provide "contextual evidence of the type[s] of advertisements and promotions it uses to gain sales.").

Applicant missed the opportunity of offering context to its sales figures by not providing any market share information, and by supplying only minimal examples of marketing materials from which such context could be shown or inferred. To the extent provided, Applicant's marketing materials do not direct the public's attention to the front or rear façades of its hotel as indicators of the source of Applicant's services. Simply, the volume of business for Applicant's hotel services does not translate to a perception of Applicant's building as an indicator of the source of those services.

On *Converse* Factor 6, attached to the declaration of Mr. Getman are 17 articles and a commemorative website discussing the construction of the Hilton Palacio del

Rio hotel.[27] The articles either were published in local San Antonio, Texas newspapers or specialty construction industry trade journals. All of the articles and the commemorative website recite essentially the same story: the ambitious prefabricated monolithic-modular construction of a hotel under a very short deadline (by building construction standards), in time for the HemisFair 1968 World's Fair in San Antonio, when the Fair's sponsors realized they did not have enough space to house the attendees of the event. Thus, the unsolicited media coverage directed to the Hilton Palacio del Rio hotel uniformly discusses its innovative construction techniques rather than directing the consumer to look for the elements of the hotel's proposed trade dress as indicators of source of the applied-for services.

In sum, in view of the highly nondistinctive building designs here at issue, we find Applicant's proffered evidence insufficient to convince us that Applicant's proposed marks composed of nondistinctive trade dress have acquired distinctiveness.

### D. Comparison of Applicant's Proposed Marks to Building Designs Previously Registered by the USPTO

With its Request for Reconsideration, Applicant made of record two registrations issued to third parties for building designs,[28] as shown in the chart below. Applicant uses these two registrations to argue the following:

> In the refusal, the Examining Attorney seems to be focused on a perceived prohibition against claiming an entire building as a mark and the inclusion of commonly shaped components in the overall design. ... However, [t]he flawed nature of … [the Examining Attorney's] position

---

[27] Getman Decl., Office Action Response of September 24, 2021, at TSDR 25-104.

[28] Request for Reconsideration of April 5, 2022, at TSDR 7-9.

is starkly illustrated by other registered marks that Applicant submitted for comparison.[29]

The third-party registrations on which Applicant relies are as follows:

| Design Mark and Description | Reg. No. & Owner | Services |
|---|---|---|
| <br><br>(The mark consists of the three dimensional configuration of the Transamerica Pyramid Building. The lining and stippling shown in the drawing are features of the mark and do not indicate color.) | 1857878 Transamerica Corporation | Financial consulting services; residential and industrial real estate; investment management and counseling services; … insurance premium financing services; insurance …; Cl. 36 |
| <br><br>(The mark consists of a depiction of the Driskill Hotel as it appeared in 1886. The stippling is a feature of the mark.) | 2651340 Driskill Holdings, Inc. | Hotels, Cl. 42 |

We afford little weight to Reg. No. 1857878, issued to Transamerica Corporation.

The mark shown in this registration is for a three-dimensional pyramid design of the

---

[29] Applicant's Brief, 6 TTABVUE 7.

Transamerica Building. This design comprises design elements that are far afield from the building designs for which Applicant seeks registration. We also afford little weight to Reg. No. 2651340 issued to Driskill Holdings, Inc. The mark shown in this registration is not for a three-dimensional building design, but rather the two-dimensional rendering of a hotel building as it appeared in the distant past. These registrations are of low probative value in our analysis.

In short, "[e]ach application for registration must be considered on its own merits." *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987); *In re Eagle Crest Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010) ("It has been said many times that each case must be decided on its own facts.") (internal citation omitted). *See also*, *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) (the USPTO must "examine all trademark applications for compliance with each and every eligibility requirement" regardless of the prior treatment of applications involving similar marks); *In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to [Applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court.").

## III.    Conclusion

Applicant's proposed marks are not inherently distinctive. Applicant has not provided sufficient evidence to demonstrate that the proposed marks have acquired distinctiveness. Applicant's comparison of its proposed marks to other building configuration service marks previously registered by the USPTO is unavailing to support its arguments for registration.

**Decision:**

The refusals to register Applicant's proposed marks are affirmed.